United States Court of Appeals,

Fifth Circuit.

Nos. 93-2315, 93-2476.

Dorothy A. EDWARDS, et al., individually and on behalf of all others similarly situated, Plaintiffs-Appellees,

v.

CITY OF HOUSTON, Defendant-Appellee,

v.

Terry HUGHES, individually and as a Representative of the Houston Airport Police Officers' Association and its Officers and Sergeants of the former Airport Police Force and Houston Police Patrolmen's Union, Intervenors-Plaintiffs, Movant-Appellants,

and

McLoy Medlock, Richard Humphrey, Willie Fields and Bennie L. Green, Movants-Appellants.

Dorothy A. EDWARDS, et al., individually and on behalf of all others similarly situated, Plaintiffs-Appellees,

v.

CITY OF HOUSTON, Defendant-Intervenor-Appellee,

v.

HOUSTON POLICE PATROLMEN'S UNION, ETC., and the individual peace officers identified in appendix A., an affiliate of The International Union of Police Associations, AFL-CIO, Local 109, Intervenor-Plaintiff and Movant-Appellant,

and

McLoy Medlock, Richard Humphrey, Willie Fields and Bennie L. Green, Consolidated-Plaintiffs and Movant-Appellants,

and

Doug Elder and Mark Clark, individually and as representatives of the general membership of the Houston Police Officers Association and all Class A Police Officers holding the Rank of Police Officer and Sergeant of Police, Movant-Appellants.

Nov. 10, 1994.

1

Appeals from the United States District Court for the Southern District of Texas.

Before REYNALDO G. GARZA, DeMOSS and PARKER, Circuit Judges.

REYNALDO G. GARZA, Circuit Judge:

Organizations representing different members of the Houston Police Department sought to intervene in a consent decree entered into by the City of Houston and a class of black and hispanic police officers. The district court denied intervention in the underlying case and also intervention for purposes of appeal. The organizations appeal the denial of these motions and also claim that consent decree violates Title VII and the Equal Protection Clause of the Fourteenth Amendment.

We find that the district court appropriately denied the motions to intervene in the underlying case; accordingly, we DISMISS those appeals. We find, however, that the district court erred in denying the motions to intervene for purposes of appeal. Therefore, we REVERSE the district court in this matter. Finally, we find that the consent decree survives scrutiny under Title VII and the Equal Protection Clause of the Fourteenth Amendment. Therefore, we AFFIRM the district court's approval of the consent decree.

## I. BACKGROUND

The original Complaint in this action was filed on August 19, 1992, under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.,* as amended by the Civil Rights Act of 1991 and the Equal Employment Opportunity Act of 1972. The plaintiffs in this action filed timely charges of racial discrimination with the EEOC,

2

alleging that the City of Houston's promotional examinations for the ranks of Sergeant and Lieutenant in the Houston Police Department discriminated against African-Americans and Hispanic-Americans between August 29, 1991 and March 26, 1992.[1] Efforts to obtain redress for the Police Department's allegedly discriminatory tests began in 1975 and 1976, when *Kelley v. Hofheinz,* C.A. No H-75-1536, and *Comeaux v. City of Houston,* C.A. No. 76-H-1754, were filed.

Among other claims, the *Kelley* and *Comeaux* cases raised the claim that the promotional examinations of the Houston Police Department discriminated against African-American police officers based on their race in violation of Title VII. These challenges to the promotional tests were based upon 1975 and 1976 EEOC charges of racial discrimination in the promotional tests. In 1979, the *Comeaux* action was consolidated into *Kelley.* In 1983, there were unsuccessful settlement discussions between the *Kelley* plaintiffs and the City of Houston.

On April 16, 1992, the City of Houston refused to consent to the intervention in *Kelley* of the Afro-American Police Officers League, the Houston Police Organization of Spanish Speaking Officers, and a group of African-American and Hispanic-American police officers. On April 17, 1992 the above groups moved for

---

[1] The entry-level uniformed position within the Houston Police Department is Police Officer. The first promotional position is currently the rank of Sergeant. Police Officers with two years of service as Police Officers are allowed to compete for the rank of Sergeant. The second promotional position is the rank of Lieutenant. Sergeants with two years of service as Sergeants are allowed to compete for the rank of Lieutenant.

3

leave to intervene in *Kelley,* alleging that they had been harmed by racially discriminatory promotional examinations for the ranks of Sergeant and Lieutenant in the Houston Police Department, that the disposition of *Kelley* could impair their interests, and that in light of the passage of time, their interests were not being represented effectively in *Kelley.* On the same day, the City of Houston moved to dismiss *Kelley* for want of prosecution.

A hearing was held on June 15, 1992, on the City of Houston's motion to dismiss *Kelley,* and on the motion for leave to intervene. The district court dismissed all claims in *Kelley* for want of prosecution except for test-promotion related claims after January 1, 1982, the district court also denied the application for leave to intervene, ordered the applicants for intervention to file a new lawsuit to be transferred to the same court, directed that the remainder of *Kelley* be consolidated into the new lawsuit, and ordered that the new plaintiff class consist of blacks and hispanics. This case was timely filed on August 19, 1992, after receipt of Notices of Right to Sue issued by the Attorney General of the U.S. The remnant of the *Kelley* case was then consolidated into this action.

The plaintiffs in this action alleged that the challenged examinations had the effect of disproportionately excluding African-Americans and Hispanic-Americans from promotion to Sergeant from 1982 to date, and of disproportionately excluding African-Americans from promotion to Lieutenant from 1982 to date. They further alleged that the examinations were not job-related or

4

consistent with business necessity.  The plaintiffs sued on their own behalf, on behalf of the African-American and Hispanic-American members of the Police Department who took a Sergeant examination from 1982 to date or who will compete for promotions to Sergeant in the future.

Settlement negotiations began in earnest between the plaintiffs and defendant City of Houston in the fall of 1992.  The settlement negotiations resulted in a proposed Consent Decree which was submitted to the district court in final form on January 21, 1993.  On February 3, 1993, the district court ordered that notice be given to all current and former Class A Peace Officers of the City of Houston whose rights and interests were affected by the Consent Decree tentatively approved by it on that date.  The notice stated that a free copy of the Consent Decree could be acquired from the Legal Services Division of the Houston Police Department. The notice also stated that March 12, 1993 was the deadline for filing objections, and that a fairness hearing was scheduled for March 24, 1993.

Before the fairness hearing was conducted, representatives of the following groups moved to intervene in the main case:  Houston Police Patrolmen's Union[2] ("HPPU");  the original named plaintiffs in the *Comeaux* action (McLoy Medlock, et al.);  Houston Police

---

[2]The HPPU appellants are comprised of 109 individual Class A Peace Officers who held the position of police officer on February 3, 1993, and 22 individual Class A Peace Officers who held the position of Sergeant on that date.  The HPPU appellants sought to intervene as class representatives of all similarly situated Class A Peace Officers holding the rank of police officer, Sergeant, or Lieutenant.

Officers Association[3]; Female Police Officers; Asian Police Officers; and Houston Parks Police Officers.

On March 17, 1993, the district court signed an order informing the parties that a hearing on the motions for intervention was scheduled for March 22, 1993. At the hearing, the Houston Airport Police Officers Association[4] made an oral motion to intervene. It later filed a written motion on March 23, 1993. After the hearing, the district court denied all of the motions for intervention, including the Airport Police Officers oral motion.

On March 24, 1993, the district court held the fairness hearing. At the fairness hearing, the applicants for intervention were allowed to: (1) cross-examine witnesses, including the plaintiffs' statistical experts and the Chief of Police; (2) proffer evidence; and (3) raise any objections to the Consent Decree. The district court again denied the motions for intervention, but allowed the applicants for intervention to file motions to intervene for purposes of appeal.

On March 25, 1993, the district court certified the following class:

a. All African-Americans who are employed, or at any time since January 1, 1982 were employed, as Class A peace officers by the Houston Police Department and who took a promotional

---

[3]Doug Elder and Mark Clark, individually and as representatives of the Houston Police Officers Association, and all Class A Police Officers, holding the rank of Police Officer and Sergeant of Police.

[4]Terry Hughes, present and former Airport Police and Airport Police Officers Association.

examination for the rank of Lieutenant or for the rank of Sergeant which was administered at any time from January 1, 1982 to the present, and those who will compete for such promotions in the future;  and

b. All Hispanic-Americans who are employed, or at any time since January 1, 1982 were employed, as Class A peace officers by the Houston Police Department and who took a promotional examination for the rank of Sergeant which was administered at any time from January 1, 1982 to the present, and those who will compete for such promotions in the future.

On March 25, 1993, the district court made one modification to the Consent Decree and made the Consent Decree a final judgment.[5] Under the terms of the Consent Decree, African-Americans and Hispanic-Americans who took an examination for Sergeant from January 1, 1982 to date, and who passed at least one examination for this rank, will receive a total of 96 remedial promotions; African-Americans and Hispanic-Americans who took an examination for Sergeant from January 1, 1982 to date, and who were promoted after a discriminatorily long waiting period which delayed their ability to compete for Lieutenant promotions will receive five remedial promotions to Lieutenant;  and African-Americans who took

---

[5]The district court added the following sentence after the first sentence of paragraph 34.

> A person who receives a remedial promotion will receive compensatory retroactive seniority only back to the date six months after the earliest test that person took for the position, even if the promotion arises from a disparity in an earlier test.

an examination for Lieutenant from January 1, 1982 to date, and passed at least one examination for this rank will receive a total of five remedial promotions. The named plaintiffs in this lawsuit who meet the necessary conditions shall have priority. The remedial promotions will be made over a five-year period. The district court saw this as a concession of great magnitude by the plaintiffs. The Consent Decree does not provide for any back pay.

The Consent Decree seeks, during the next ten years, to reduce the amount of adverse impact against African-Americans and Hispanic-Americans taking exams for Sergeant and Lieutenant: (a) by striking "racially biased items"; and (b) by extending the life of promotional registers during this period of time to two years.

The Consent Decree supersedes some provisions of the Fire and Police Civil Service Act and the Texas Local Government Code chapter 143, as amended. Paragraph 55 provides a mechanism for striking from the test those items which the City identifies as biased items and which are not job-related. Paragraph 55(g) provides that the promotional registers of test passers remain in effect for two years rather than one. Finally, the need to perform statistical analysis of responses and to examine test items for bias necessitates a short postponement of release of the test results. Paragraph 55(f) requires that an eligibility list for promotions be posted as soon as possible.

On May 20, 1993 the district court denied motions to intervene for purposes of appeal by the following groups: Houston Police Patrolman's Union ("HPPU"); Houston Airport Police Officers

8

Association; Female Police Officers; Houston Police Officers Association; and the original named plaintiffs in the *Comeaux* action (McLoy Medlock, et al.).

The HPPU appellants and the Houston Airport Police Officers Association appeal the district court's denial of their motions to intervene in the underlying case. The HPPU appellants, the Houston Airport Police Officers Association, the Houston Police Officers Association, and the original named plaintiffs in the *Comeaux* action appeal the district court's denial of their motions to intervene for purposes of appeal. The HPPU appellants and the original named plaintiffs in the *Comeaux* action also appeal the district court's approval of the Consent Decree. Finally, the Houston Airport Police Officers Association appeals the district court's approval of paragraph 61 of the Consent Decree, entitled "Reclassification of Peace Officers."[6]

## II. DISCUSSION

1. *Did the district court improperly deny the appellants' motions to intervene in the underlying case?*

The HPPU appellants and the Houston Airport Police Officers Association appeal the district court's denial of their motions to intervene in the underlying case. They claim that the district court improperly denied their motions to intervene. They claimed the right to intervene pursuant to Federal Rule of Civil Procedure

---

[6]The Houston Parks Police Officers filed an amicus brief in support of the Airport Police Officers position.

24(a)[7] in part based upon the Civil Rights Act of 1991 provision which prohibits subsequent attacks on a Consent Decree entered in a Title VII proceeding, through separate litigation unless the objections and complaints are raised in the original proceeding. (42 U.S.C. § 2000e-2(n)(1)(B)). They allege that by refusing to permit intervention, the district court substantially limited their ability to challenge the Consent Decree. They claim that they met all the requirements for intervention of right.

The HPPU appellants assert that the principal ground relied upon by the district court for denying their motion was timeliness. They claim that their motion for intervention meets this court's test for timeliness set out in *Corley v. Jackson Police Dept.*, 755 F.2d 1207, 1209 (5th Cir.1985) (citing *Stallworth v. Monsanto Co.*, 558 F.2d 257, 263 (5th Cir.1977)). They first argue that they met the district court's deadline by filing their motion on March 12, 1993. They further argue that their motion was filed just 37 days after the district court published notice of the terms of the Consent Decree and less than six months after the City of Houston filed its answer denying all of the plaintiff's allegations. They also argue that although rumors of a proposed consent decree began

---

[7]Upon timely application anyone shall be permitted to intervene in an action: (1) when a statute of the United States confers an unconditional right to intervene; or (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties. Federal Rule of Civil Procedure 24(a).

to circulate in late December 1992, they were not able to obtain, despite repeated efforts, any specific information regarding the Consent Decree until the February 3, 1993 notice was published. They claim that it was the appellees' own conduct, in refusing to disclose the terms of the decree sooner, that caused any delay. Finally, they argue that the appellees can hardly show prejudice from any delay, since the appellees were required to give notice of the decree so that objections could be filed.

The Airport Police Officers Association ("Airport Police") also claims that its application to intervene was timely. The Airport Police argue that they sought to intervene within a few weeks after obtaining a copy of the proposed Consent Decree. The Airport Police further argue that it is undisputed that they had no possible way of knowing prior to obtaining a copy of the proposed Consent Decree that it would contain a provision, such as paragraph 61, singling them out and seemingly intended to deny them the very transfer rights they won after lengthy litigation with the City of Houston.

The Airport Police also claim that they meet the test for timeliness set out in *Corley v. Jackson Police Dept., supra.* The Airport Police argue that the amount of time during which they could have known of their interest in the case before seeking to intervene was minimal. The Airport Police further argue that the appellees have not shown prejudice from any delay. Finally, the Airport Police argue that their prejudice from denial of intervention is substantial.

The HPPU appellants and the Airport Police alternatively sought permissive intervention under Federal Rule of Civil Procedure 24(b).

Denial of intervention of right is a question of law which we review *de novo*. *Ceres Gulf v. Cooper,* 957 F.2d 1199, 1202 (5th Cir.1992). Denial of permissive intervention is reviewed for clear abuse of discretion. *Korioth v. Briscoe,* 523 F.2d 1271, 1278 (5th Cir.1975).

At the hearing on the applications for intervention in the underlying case, the district judge stated that the appellants, "were entitled to ask to intervene earlier." He also stated that the appellants could not have more time, and that he was "not going to delay this [process]." Finally, the district judge stated, "I don't need an additional party's litigant at the last moment. Your clients have a copy—or had available to them a copy of the Police Chief's December 16th memorandum[8] on the potential settlement."

---

[8]

Circular
Houston Police Department

December 16, 1992                                No. 92-1216-1

SUBJECT:                      POTENTIAL SETTLEMENT

The Department has agreed in principle to settle a long standing lawsuit regarding our promotional system. The details of this settlement are still being negotiated; however, I want to give as much correct information as I can now. A proposed version of the agreement will be filed in Federal Court on Tuesday, December 22, 1992. Shortly after that date, I should be able to give you detailed information. The following aspects are being negotiated and are likely to become part of the final settlement.

12

Based on these statements, we conclude that the district court denied the applications for intervention in the underlying case on the basis of untimeliness.

"Whether leave to intervene is sought under section (a) or (b) of Rule 24, the application must be timely." *Stallworth v. Monsanto Co.,* 558 F.2d 257, 263 (5th Cir.1977).

> "Timeliness," ... is not a word of exactitude or of precisely measurable dimensions. Rule 24 fails to define it, and the Advisory Committee Note furnishes no clarification. As a result, the question of whether an application for intervention is timely is largely committed to the discretion of the district court, and its determination will not be overturned on appeal unless an abuse of discretion is shown.

---

## Settlement Summary

1. A number, yet to be determined, of minority police officers and sergeants will be promoted to sergeant and lieutenant. The promotions will be based on the lists established during the years 1982 through 1991.

2. Remedial promotions will be completed over a four to five year period.

3. A statistical analysis will be utilized on future promotional exams for sergeant and lieutenant to identify any racially biased questions. The questions identified as such will be thrown out after the tests.

4. Current and future sergeant and lieutenant promotional lists will remain in existence for two years.

5. The procedures agreed on will be monitored by the Federal Court for ten years.

6. All Class A officers will receive official notification of the Court's consent decree and will be an opportunity to address their concerns to the Court.


Sam Nuchia
Chief of Police

13

*Id.* (citing *NAACP v. New York,* 413 U.S. 345, 367, 93 S.Ct. 2591, 2603-04, 37 L.Ed.2d 648 (1973)).

In *Stallworth,* we developed four factors to be considered in determining whether a motion to intervene was timely:

> Factor 1. The length of time during which the would-be intervenor actually knew or reasonably should have known of his interest in the case before he petitioned for leave to intervene....

> Factor 2. The extent of the prejudice that the existing parties to the litigation may suffer as a result of the would-be intervenor's failure to apply for intervention as soon as he actually knew or reasonably should have known of his interest in the case....

> Factor 3. The extent of the prejudice that the would-be intervenor may suffer if his petition for leave to intervene is denied....

> Factor 4. The existence of unusual circumstances militating either for or against a determination that the application is timely....

*Id.* at 264-66. "*Stallworth* is not an algorithm, but a framework for analysis." *Corley v. Jackson Police Dept.,* 755 F.2d 1207, 1209 (5th Cir.1985) (quoting *Lelsz v. Kavanagh,* 710 F.2d 1040, 1043 (5th Cir.1983)).

As the appellees point out, Chief of Police Nuchia met with the presidents of the Houston Police Officers Association and the Houston Police Patrolmans Union on November 4, 1992. At these meetings, Chief of Police Nuchia informed the representatives of those two groups that the City of Houston was undergoing settlement discussions with the plaintiffs. Moreover, on December 16, 1992, Chief of Police Nuchia issued a departmental circular to all police officers informing them of the potential settlement in this lawsuit.

14

*Factor 1.* The appellants erroneously contend that we should consider February 3, 1993, the date the district court sent out formal notice, as the date from which to consider timeliness. As *Stallworth* makes clear, timeliness is measured from the point in time at which the applicant for intervention actually knew or reasonably should have known of his interest in this case. Based on the fact that Chief of Police Nuchia notified the appellants not only personally, but through the form of a departmental circular, there is no question that the appellants actually knew or should have known of their interest in this case in November or December of 1992. Therefore, the appellants waited three and a half to four and a half months before applying for intervention. Standing alone, this would probably not merit a finding of untimeliness, however, it certainly does not bode in the appellants' favor.

*Factor 2.* The second factor relates to the prejudice to the existing parties if the appellants' intervention is allowed. In this case, what is of particular importance is not so much the length of the appellants' delay in filing for intervention, as what occurred during the period of that delay. During this period of delay, the proposed Consent Decree was put into final conceptual form. The interests of the City of Houston, of both groups in the plaintiff class, and of other employees were considered and meshed to the greatest extent possible; the number of remedial promotions was negotiated; and the seniority complications caused by the plaintiffs' concessions to the City of Houston and to non-class-members in stretching out the remedial promotions over

15

five years were worked out. Therefore, as in *Corley v. Jackson Police Dept.,* 755 F.2d 1207, 1210 (5th Cir.1985), the prejudice is apparent. "A negotiated settlement of a difficult problem is put at risk, to the disadvantage of the named parties, the class, the police department and the City." *Id.*

*Factor 3.* The third factor contemplates the extent of prejudice the applicant for intervention would suffer if his motion for intervention is denied. In this case, there is no prejudice to the appellants. At the fairness hearing, the appellants were allowed to present testimony and argument on their written objections to the Consent Decree. The appellants were also allowed to cross-examine Chief of Police Nuchia and the plaintiffs' statistical experts. The district court considered all of the appellants' objections to the Consent Decree. The district court, in the Findings of Fact and Conclusions of Law, answered each of the appellants' objections and stated why it was not persuaded by their arguments. In essence, the appellants were treated as if they were parties to the lawsuit. Thus, the appellants have already been afforded the substance of the benefits of intervention as to all their objections. The appellants have had their day in court.

*Factor 4.* There are no unusual circumstances militating either for or against a determination that the appellants' applications were timely.

From the perspective of the *Stallworth* analysis, we find that the district court did not abuse its discretion in rejecting the

appellants' applications for intervention.  Therefore, the appeals on the denial of intervention in the underlying case are dismissed.

2. *Did the district court err in denying the appellants' applications to intervene for purposes of appeal?*

All of the appellants claim that the district court erred in denying their motions to intervene for purposes of appeal.  The appellants claim that they meet all of requirements to intervene as of right pursuant to Federal Rule of Civil Procedure 24(a).  They claim that this court established four requirements which must be met to demonstrate a right to intervene:  (1) the application to intervene must be timely;  (2) the applicant must have an interest relating to the property or transaction which is the subject of the action;  (3) the applicant must be so situated that disposition of the action may, as a practical matter, impair or impede, his ability to protect that interest;  and (4) the applicant's interest must be inadequately represented by existing parties. *New Orleans Public Service v. United Gas Pipe Line Co.,* 732 F.2d 452, 463 (5th Cir.) (en banc), *cert. denied sub nom., Morial v. United Gas Pipe Line Co.,* 469 U.S. 1019, 105 S.Ct. 434, 83 L.Ed.2d 360 (1984).

The appellants all claim that their motions to intervene for purposes of appeal were timely filed.  They argue that their motions were filed by the district court's April 19, 1993 deadline.

The HPPU appellants also claim that the district court, by refusing to permit intervention, substantially limited the HPPU appellants' ability to challenge the Consent Decree.  They argue that because the terms of the Consent Decree authorize the City of Houston to continue to impermissibly discriminate against them, and

17

because the Consent Decree will remain in effect for ten years under the district court's jurisdiction, the district court's refusal to allow intervention has effectively denied them their right to participate in this and future proceedings affecting their promotional opportunities.

The Airport Police argue, with regard to the second factor of the *New Orleans Public Service* test, that if the City of Houston complies with paragraph 61 of the Consent Decree, they will be confined to the airport and will be unable to transfer elsewhere in the City for the next ten years of their careers. The Airport Police argue that their career paths and promotional opportunities will be sharply curtailed. The Airport Police conclude, therefore, that their interest in this transaction is "legally protectable."

The Airport Police further argue that if the City complies with paragraph 61, the City will violate the state court decree which directs the City to afford each Airport Officer the same transfer rights as are afforded to Officers of corresponding rank in the Patrol Divisions of the Houston Police Department.

The original plaintiffs in the *Comeaux* action argue, in reference to the third factor, that the Consent Decree impairs or impedes their ability to protect their interests. They argue that their claims for years prior to 1982 were literally wiped out. They concede that these claims were dismissed in 1992. However, they claim that this was in error and that they should have been afforded relief in the Consent Decree. With regard to the fourth factor, they claim that the plaintiffs had a clear interest in

18

dismissing the pre-1982 claims, and that the City had an interest in dismissing those claims to avoid complying with any benefits or back pay awards.

The Houston Police Officers Association argues with regard to the fourth factor, that their interests in the underlying case were not the same and to a large extent, diametrically opposite from those of the plaintiffs and defendant City of Houston. Specifically, the Consent Decree was the end result of settlement negotiations between the plaintiffs and the City only. The interests of the Houston Police Officers Association was in no way factored into the settlement agreement. The Association further argues that the remedial promotions will cause persons with lower scores to be promoted over individuals who performed better on the promotional exams.

All of the appellants alternatively sought permissive intervention under Federal Rule of Civil Procedure 24(b). The appellants argue that since their claims all arose out of the proposed Consent Decree, there were common questions of law and fact.

As stated earlier, denial of intervention of right is a question of law which we review *de novo*. *Ceres Gulf v. Cooper,* 957 F.2d at 1202. In order to determine whether a party has demonstrated a right to intervene, we examine the four requirements set out in *New Orleans Public Service,* 732 F.2d at 463.

First, all of the appellants' motions to intervene were timely filed. The appellants filed their motions before the district

19

court's deadline on filing the motions to intervene for purposes of appeal.

With regard to the second requirement, the critical question is what type of interest the appellants have in the promotional system. To demonstrate an interest in the transaction sufficient to support intervention as of right, an applicant "must demonstrate a "direct, substantial and legally protectable' interest in the property or transaction that is the subject of the suit." *League of United Latin American Citizens v. Clements,* 884 F.2d 185, 187 (5th Cir.1989) (quoting *New Orleans Public Service,* 732 F.2d at 463). The appellants' interest is in making sure that the promotional system is not manipulated in such a manner, that it discriminates against them. This interest is sufficient to support intervention as of right.

To meet the third requirement, the applicant must be so situated that disposition of the action may, as a practical matter, impair or impede, his ability to protect that interest. *New Orleans Public Service,* 732 F.2d at 463. Although, the appellants were treated as if they were parties in the underlying action, the district court did not allow the appellants to benefit from appellate review of the Consent Decree. The appellants were able to protect their interests below because they were able to bring forth all of their objections and arguments. However, part of the ability to protect their interests is the ability to subjugate the district court's disposition of their case to appellate scrutiny. We stated earlier that the appellants have had their day in court.

Concomitant with having one's day in court is appellate review of that day.

The fourth requirement inquires whether the applicant for intervention's interest is adequately represented by existing parties. *Id.* The appellants' interests were adequately protected in the district court because they were given the opportunity to represent their own interests. However, when the district court denied their applications for intervention for purposes of appeal, none of the existing parties adequately represented the appellants' interests. This is evidenced by the fact that neither the City of Houston nor the plaintiffs sought appellate review of the Consent Decree. Those two parties were content with their settlement, while the appellants obviously were not.

We find that the appellants meet all of the requirements to intervene as of right for purposes of appeal. Thus, it is unnecessary to determine whether the district court abused its discretion in denying permissive intervention.

We, therefore, reverse the district court's denial of the appellants' motions to intervene for purposes of appeal.

Having found that the district court erred in this manner, we now turn to the appellants' substantive arguments.

3. *Did the district court err in approving the Consent Decree?*

The HPPU appellants argue that this circuit requires a district court to become more involved in the settlement process when it is called upon to approve a Title VII consent decree. They argue that the district court failed to review the terms of the

21

Consent Decree and the evidence in support of it with sufficient scrutiny. They also argue that the Eleventh Circuit has held that the operative law for judging a consent decree is the same as that for voluntary affirmative acts. *In re Birmingham Reverse Discrimination Employment Litigation,* 833 F.2d 1492, 1501 (11th Cir.1987). They further argue that the district court should have used a strict scrutiny standard because the Consent Decree on its face provides for both "racial quotas" and future racial classifications. *See City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 493, 109 S.Ct. 706, 721, 102 L.Ed.2d 854 (1989). Finally, they argue that the district court's failure to take into account the special deference allowed to police departments in determining "job related" testing, constituted an abuse of its discretion. *See Davis v. City of Dallas,* 777 F.2d 205, 211 (5th Cir.1985), *cert. denied,* 476 U.S. 1116, 106 S.Ct. 1972, 90 L.Ed.2d 656 (1986).

The HPPU appellants also argue that in a case in which the Fourteenth Amendment is properly invoked, race conscious relief may only be employed to remedy identifiable past discrimination, and relief may only be granted to the victims of that discrimination.

> [F]or the governmental interest in remedying past discrimination to be triggered "judicial, legislative, or administrative findings of constitutional or statutory violations" must be made. Only then does the government have a compelling interest in favoring one race over another.

*Richmond v. Croson,* 488 U.S. at 497, 109 S.Ct. at 723 (quoting *California Regents v. Bakke* 438 U.S. 265, 307, 98 S.Ct. 2733, 2757, 57 L.Ed.2d 750 (1978)). Furthermore, the governmental entity must have a "strong basis in evidence for its conclusion that remedial

22

action was necessary."  *Id.* at 500, 109 S.Ct. at 725 (quoting *Wygant v. Jackson Bd. of Educ.,* 476 U.S. 267, 277, 106 S.Ct. 1842, 1848-49, 90 L.Ed.2d 260 (1986)).

The HPPU appellants' argue that the district court failed to require such a strong basis in the evidence.  The only evidence of past discrimination is the questionable statistical analysis performed by plaintiffs' counsel.  They also contend that there was no attempt by the district court to determine whether the promotional exams measured performance of skills necessary for the jobs of Sergeant and Lieutenant of police within the Houston Police Department.  They further contend that the City did not make any attempt to validate the contents of the exams.

The HPPU appellants argue that the law draws a distinction between relief that is intended to remedy the effect of past discrimination and relief which is designed to compensate an individual who has been the specific victim of past discrimination. *See Firefighters Local Union No. 1784 v. Stotts,* 467 U.S. 561, 578-79, 104 S.Ct. 2576, 2587-88, 81 L.Ed.2d 483 (1983).  They contend that in the instant case there was no evidence to support any finding that any of the individuals who would be receiving the 106 remedial promotions were the actual victims of any discrimination. They further contend that the Consent Decree establishes an unconstitutional pool of positions available for the promotions of individuals within the Houston Police Department based solely upon their race.  *See generally Bakke;  Wygant;  Firefighters.*

The HPPU appellants also contend that the Consent Decree fails

23

to narrowly tailor the prospective relief provided to the disparity shown and unnecessarily trammels the interests of non-Black, non-Hispanic officers within the Police Department in a way that violates the standards applicable to even non-public employers. *See United Steel Workers of America v. Weber,* 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979).

The HPPU appellants further contend that the Consent Decree was collusive and/or fraudulent and/or transparently invalid. They also contend that the Consent Decree contains several provisions which violate Title VII. For example, the Consent Decree divests them of vested promotional and seniority rights under a valid merit based promotional testing procedure. Paragraph 55 of the Consent Decree authorizes the Police Department to adjust future promotional test scores on the basis of race. The Consent Decree further provides for readjustment to scores in the event the "log linear" analysis results in failing an officer who otherwise passed the exam.

Finally, the HPPU appellants argue that the district court's refusal to allow them, and others, to present the testimony they had prepared to demonstrate the questionable validity of the Consent Decree, deprived them of a fair and equal opportunity to protect their rights under the law. Thus, their equal protection and due process rights were impaired.

The Airport Police Officers claim that the district court erred in approving paragraph 61 of the Consent Decree. They contend that the legitimate purposes of the Consent Decree are to

cure the ethnic bias of the promotional exams and to improve the racial mix of the Sergeant and Lieutenant ranks of the Police Department. Paragraph 61 purports to further these goals by totally excluding them from even taking the tests. They argue that excluding them from taking the tests will not make the tests less biased. Likewise, their exclusion has no relationship to improving the racial mix of the Sergeant and Lieutenant ranks.

The original *Comeaux* plaintiffs argue that the Consent Decree is woefully unjust, unfair, unreasonable and inadequate. Under the Consent Decree some of the class members do not receive relief, including monetary relief; the relief for the appellee-plaintiffs is significantly greater than their relief; and some members of the certified class are treated differently than other class members. They also argue that the wrongful dismissal of their claims precluded them from being included in the negotiations leading to the Consent Decree. They further argue that even where there is a clear record of delay, the sanction of dismissal is justified only where a lesser sanction would not suffice.

Under the terms of the Consent Decree, African-Americans and Hispanic-Americans who took an examination for Sergeant from January 1, 1982 to date, and who passed at least one examination for this rank, will receive a total of 96 remedial promotions. Since African-Americans suffered 64.67 of the shortfall in Sergeant promotions, they will receive 64.67 of the remedial promotions to Sergeant, for a total of 62 remedial promotions to Sergeant. Hispanic-Americans suffered 35.47 of the shortfall in Sergeant

25

promotions, hence, they will receive 35.47 of the remedial promotions to Sergeant, for a total of 34 for remedial promotions to Sergeant. African-Americans and Hispanic-Americans who took an examination for Sergeant from January 1, 1982 to date, and who were promoted after a discriminatorily long waiting period which delayed their ability to compete for Lieutenant promotions will receive five remedial promotions to Lieutenant. African-Americans will receive three of those promotions and Hispanic-Americans will receive two of those promotions. Finally, African-Americans who took an examination for Lieutenant from January 1, 1982 to date, and who passed at least one examination for this rank will receive a total of five remedial promotions.

The Consent Decree seeks, during the next ten years, to reduce the amount of adverse impact against black and hispanic police officers taking the promotional exams by: (a) striking items biased against any race; and (b) extending the life of the promotional registers during this period to two years.

The appellants attack the Consent Decree's validity under Title VII and the Equal Protection Clause of the Fourteenth Amendment. Although the obligations of a public employer under Title VII are similar to its obligations under the Federal Constitution, they are not the same.[9] We, therefore, examine each

---

[9] Justice Scalia's dissent maintains that the obligations of a public employer under Title VII must be identical to its obligations under the Constitution, and that a public employer's adoption of an affirmative action plan therefore should be governed by *Wygant*.... "Title VII, by contrast, was enacted pursuant to the commerce power to regulate purely private decision making and

26

of the appellants' arguments in turn.

*Validity under Title VII*

"In Title VII litigation, this Court had held that the district court is entitled to a substantial measure of discretion in dealing with consent decrees, and that as a result "on appeal, our duty is to ascertain whether or not the trial judge clearly abused his discretion....' " *Williams v. City of New Orleans,* 729 F.2d 1554, 1558 (5th Cir.1984) (en banc) (quoting *Cotton v. Hinton,* 559 F.2d 1326, 1331 (5th Cir.1977)).

> As a preliminary matter, we note that petitioner bears the burden of establishing the invalidity of the [Consent Decree].... Once a plaintiff establishes a prima facie case that race or sex has been taken into account in an employer's employment decision, the burden shifts to the employer to articulate a nondiscriminatory rationale for its decision. The existence of an affirmative action plan provides such a rationale. If such a plan is articulated as the basis for the employer's decision, the burden shifts to the plaintiff to prove that the employer's justification is pretextual and the plan is invalid. As a practical matter, of course, an employer will generally seek to avoid a charge of pretext by

---

> was not intended to incorporate and particularize the commands of the Fifth and Fourteenth Amendments." *United Steelworkers of America v. Weber,* 443 U.S. 193, 206 n. 6, 99 S.Ct. 2721, 2729 n. 6, 61 L.Ed.2d 480 (1979).
>
> The fact that a public employer must also satisfy the Constitution does not negate the fact that the *statutory* prohibition with which that employer must contend was not intended to extend as far as that of the Constitution.
>
> *Johnson v. Transportation Agency,* 480 U.S. 616, 627 n. 6, 107 S.Ct. 1442; 1450 n. 6, 94 L.Ed.2d 615 (1987) (explaining why the Transportation Agency's affirmative action plan should be analyzed under *Weber* (Supreme Court addressed the question whether the employer violated Title VII by adopting a voluntary affirmative action plan), rather than *Wygant v. Jackson Bd. of Educ.,* 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986) (Equal Protection analysis)).

27

presenting evidence in support of its plan. That does not mean, however, as petitioner suggests, that reliance on an affirmative action plan is to be treated as an affirmative defense requiring the employer to carry the burden of proving the validity of the plan. The burden of proving its invalidity remains on the plaintiff.

*Johnson v. Transportation Agency,* 480 U.S. 616, 626-27, 107 S.Ct. 1442, 1449, 94 L.Ed.2d 615 (1987).

There is no doubt that the Consent Decree's remedial promotions take race into account. Thus, the appellants have made their prima facie case. We now turn to the validity of the Consent Decree.

The Supreme Court in *Johnson* articulated a two-prong test for determining whether a race-conscious affirmative action plan comports with Title VII. "The first issue ... is whether the consideration of sex [or race][10] of applicants ... was justified by the existence of a "manifest imbalance' that reflected underrepresentation of women [or minorities] in "traditionally segregated job categories.' " *Id.* at 631, 107 S.Ct. at 1451-52 (citing *Weber,* 443 U.S. at 197, 99 S.Ct. at 2724). "We next consider whether the Agency Plan [race-conscious plan] unnecessarily trammeled the rights of male [or nonminority] employees or created an absolute bar to their advancement." *Id.* at 637-38, 107 S.Ct. at 1455.

A.

---

[10]"Because of the employment decision at issue in this case, our decision henceforth refers primarily to the Plan's provision to remedy the underrepresentation of women. Our analysis could apply as well, however, to the provisions of the plan pertaining to minorities." *Johnson,* 480 U.S. at 635 n. 13, 107 S.Ct. at 1454 n. 13.

28

In determining whether an imbalance exists that would justify taking race into account, a comparison of the percentage of minorities in the employer's workforce with the percentage in the appropriate labor market is required. *See Id.* at 631-32, 107 S.Ct. at 1451-52 (citing *Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). Where a job requires training, the comparison should be with those minorities in the labor force who possess the relevant qualifications. *Id.* (citing *Hazlewood School District v. United States,* 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977). The manifest imbalance requirement is not the same as a prima facie case against an employer. "A manifest imbalance need not be such that it would support a prima facie case against the employer, as suggested in Justice O'Connor's concurrence, *post,* [480 U.S.] at 649 [107 S.Ct. at 1461], since we do not regard as identical the constraints of Title VII and the Federal Constitution on voluntarily adopted affirmative action plans." *Id.* at 632, 107 S.Ct. at 1452; *see also, Id.* at 632 n. 10, 107 S.Ct. at 1453 n. 10 (explaining the difference between "manifest imbalance" and "prima facie").

The plaintiffs' evidence contained statistical analysis on each of the Sergeant and Lieutenant examinations from 1982 to 1991. The plaintiffs provided the district court with statistical evidence on the number of total test takers for each exam, the number of test takers by racial or cultural classification, the total number of those promoted, the number of those promoted by classification, the percentage of those promoted by classification,

29

the promotion rates of blacks and hispanics as a percentage of whites promoted, the number of expected promotions for blacks and hispanics, the difference between actual and expected promotions for blacks and hispanics, the number of standard deviations between expected and actual promotions, and racial disparities in mean and median written scores. The District Court found that no objector presented any credible evidence that any factor other than the challenged tests, accounted for any meaningful part of the racial disparities in the promotion rates between the different racial groups.

The relevant labor market that was used in this case was the number of minority police officers who took the promotional examinations. Undoubtedly, a comparison was made to the appropriate labor market.[11] We find that the plaintiffs established a manifest imbalance in promotion rates for black and hispanic officers, and that they brought this to the City of Houston's attention.

B.

Having found that the Consent Decree meets the first requirement of the *Johnson* analysis, we now examine whether the Consent Decree unnecessarily trammels the rights of nonminorities or creates an absolute bar to their advancement.

---

[11]*Johnson* states that where a job requires special training, the comparison should be with those in the labor force who possess the relevant qualifications. *Johnson,* 480 at 632, 107 S.Ct. at 1452. Therefore, we do not reach the issue of whether the number of minorities in the police force is the only relevant labor market.

In this case, the Consent Decree does not provide any remedy for blacks or hispanics who failed the promotional tests at issue. Minorities who fail the promotional tests are not eligible for remedial promotions. *See Johnson* 480 U.S. at 636, 107 S.Ct. at 1454 (if plan fails to take distinctions in qualifications into account, it would dictate mere blind hiring by numbers). Furthermore, the remedial promotions are being granted on a one-time-only basis. The Consent Decree does not call for any remedial promotions after the five-year phase in period. With regard to the elimination of future test questions which are racially biased, questions biased against any race will be eliminated. This will provide benefits to minority and nonminority police officers. The elimination of racially biased questions will occur only over a ten-year period. After that period of time, the City will no longer face this constraint. Likewise, the extension of promotional lists from one to two years increases the possibility of promotion for all police officers.

The Consent Decree does not require the discharge of nonminority officers and their replacement with new minority officers. *See United Steelworkers of America v. Weber,* 443 U.S. 193, 208, 99 S.Ct. 2721, 2729, 61 L.Ed.2d 480 (1979). Furthermore, the Consent Decree does not create an absolute bar to the advancement of nonminority officers. *Id.* Although nonminority officers may not be promoted at exactly the same rate and numbers as before, they will continue to be promoted in substantial excess of their representation among test takers. Finally, the Consent

31

Decree in this case is a temporary measure. It is not intended to maintain any specific racial balance, rather it attempts to alleviate a manifest racial imbalance.

Therefore, the Consent Decree does not unnecessarily trammel on the interests of nonminorities, nor create an absolute bar to their advancement.

Since the Consent Decree is justified by a manifest imbalance that reflected the underrepresentation of minority police officers in the Sergeant and Lieutenant ranks, and the Consent Decree does not unnecessarily trammel on the rights of nonminority officers, we conclude that the district court did not abuse its discretion in approving the Consent Decree under Title VII.

*Validity under the Equal Protection Clause*

Having found that the Consent Decree is valid under Title VII, we now examine its validity under the Equal Protection Clause of the Fourteenth Amendment.[12]

"A district court evaluating a proposed Title VII consent decree must determine whether the decree will have an unreasonable or unlawful impact on third parties if approved." *Black Fire Fighters Ass'n v. City of Dallas,* 19 F.3d 992, 995 (citing *Williams v. City of New Orleans,* 729 F.2d 1554, 1559-60 (5th Cir.1984) (en banc)). Voluntary affirmative-action plans memorialized in a

---

[12]"Of course, where the issue is properly raised, public employers must justify the adoption and implementation of a voluntary affirmative action plan under the Equal Protection Clause." *Johnson,* 480 U.S. at 620, 107 S.Ct. at 1446 (1987) (citing *Wygant v. Jackson Board of Education,* 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986)).

consent decree are considered equivalent to voluntarily adopted affirmative-action plans for purposes of equal protection analysis. *Howard v. McLucas,* 871 F.2d 1000, 1006 (11th Cir.1989), *cert. denied sub nom., Poss v. Howard,* 493 U.S. 1002, 110 S.Ct. 560, 107 L.Ed.2d 555 (1989); *In re Birmingham Reverse Discrimination Employment Litigation,* 833 F.2d 1492, 1501 (11th Cir.1987). Race-conscious remedial measures receive strict scrutiny under the Equal Protection Clause. *Black Fire Fighters Ass'n,* 19 F.3d at 995 (citing *City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 492-97, 109 S.Ct. 706, 721-23, 102 L.Ed.2d 854 (1989) (4-Justice plurality); *Wygant v. Jackson Bd. of Educ.,* 476 U.S. 267, 274, 106 S.Ct. 1842, 1847, 90 L.Ed.2d 260 (1986) (4-Justice plurality). "There are two prongs to this examination. First, any racial classification "must be justified by a compelling governmental interest.' Second, the means chosen by the State to effectuate its purpose must be "narrowly tailored to the achievement of that goal." *Wygant,* 476 U.S. at 274, 106 S.Ct. at 1847 (internal citations omitted).

The Supreme Court has "insisted upon some showing of prior discrimination by the governmental unit involved before allowing limited use of racial classifications in order to remedy such discrimination." *Id.* (citing *Hazlewood School District v. United States,* 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977)).

> Evidentiary support for the conclusion that remedial action is warranted becomes crucial when the remedial program is challenged in court by nonminority employees.... In such a case, the trial court must make a factual determination that the employer had a strong basis in evidence for its conclusion that remedial action was necessary. The ultimate burden

remains with the employees to demonstrate the unconstitutionality of an affirmative-action program. But unless such a determination is made, an appellate court reviewing a challenge by nonminority employees to remedial action cannot determine whether the race-based action is justified as a remedy for prior discrimination.

*Id.* at 277-78, 106 S.Ct. at 1849.

In this case the district court specifically found that:

Plaintiffs have proven the disparate impact of the challenged examinations. Their expert testimony and other evidence created substantial doubt as to the job-relatedness of the challenged tests. It is not necessary for the Court to resolve the question whether the challenged examinations were job-related. Plaintiffs have shown a sufficiently firm basis for the relief provided in the proposed Consent Decree.

As stated in the section discussing the validity of the Consent Decree in Title VII, the plaintiffs provided detailed statistics on the promotion rates of nonminorities, blacks and hispanics. The plaintiffs also identified numerous questions on the examinations which they alleged were extremely difficult to defend as job-related and consistent with business necessity. Clearly, the district court had ample evidence from which to conclude that the plaintiffs had proven disparate impact and that the City of Houston had justifiably concluded that it would be difficult to defend the job-relatedness of the questions on the promotional exams. More importantly, the City of Houston had a strong basis in evidence to conclude that remedial action was necessary.

Having found that the Consent Decree's racial classifications are justified by a compelling governmental interest, namely remedying prior discrimination, we must now decide whether the Consent Decree is narrowly tailored to the achievement of that

34

goal.

The Supreme Court has focused on several factors in analyzing race-conscious remedial measures: the necessity for the relief and the efficacy of alternative remedies; the flexibility and duration of the relief, including the availability of waiver provisions; the relationship of the numerical goals to the relevant labor market; and the impact of the relief on the rights of third parties. *United States v. Paradise,* 480 U.S. 149, 171, 107 S.Ct. 1053, 1066, 94 L.Ed.2d 203 (1987) (4-Justice plurality).

*Necessity for particular relief*

In order to evaluate the district court's determination that the remedial promotions, the elimination of racially biased test questions on future exams, and the extension of the promotional lists from one to two years, were necessary, we must examine the purposes the relief was intended to serve. *Id.* The Consent Decree was entered into in this case to remedy past discrimination and to alleviate the adverse impact of the promotional exams in the future. The remedial promotions are only directed to those positions where the discrimination occurred. Moreover, those promotions are only for those who most likely suffered discrimination and in direct proportion to the amount of discrimination they suffered. As the district court pointed out, Asians and women were not allowed to become part of the plaintiff class because they could not show that they were discriminated against in the promotional exams.

*The Flexibility and Duration of the Relief*

35

To determine whether the Consent Decree meets the narrow tailoring requirement, consideration of the flexibility and duration of its proposed relief, must be undertaken.

The Consent Decree proposes remedial promotions which will be stretched over a five year period, the elimination of questions biased against any race over a ten year period, and the extension of promotional lists from one to two years. The relief which the Consent Decree proposes does not continue indefinitely. Rather, it is of a temporary nature. The district court found that the plaintiffs' agreement to have the remedial promotions phased in over five years was a concession of great magnitude. The remedial promotions will be phased in over a great period of time solely to make sure that the disruption within the police department is minimized. The fact that racially biased questions will be eliminated from exams for ten years does not mar the Consent Decree, because questions biased against all races will be eliminated. Thus, all police officers will benefit. Likewise, the extension of the promotional lists to two years will help the promotional opportunities of all police officers.

With regard to flexibility, the Consent Decree does not impose rigid quotas against the police department. The Consent Decree requires only the remedial promotion of qualified blacks and hispanics. Only members of the plaintiff class who have passed the appropriate promotional exam are eligible for promotion. *See United States v. Paradise,* 480 U.S. 149, 177, 107 S.Ct. 1053, 1069, 94 L.Ed.2d 203 (1987) (fact that requirement to promote blacks on

a one for one ratio with whites could be waived if no qualified black candidates were available, weighed in favor of the flexibility of an affirmative action plan under equal protection analysis). Hence, the police department is never required to promote an unqualified minority in preference of a qualified nonminority.

More importantly, the Consent Decree is not designed to maintain any particular racial balance. The police department is not required to increase the number of minority promotions simply because it happens to promote more nonminorities in the future.

*Numerical Goals*

Another method of determining whether the proposed relief is narrowly tailored, is to examine the relationship of the numerical goals to the relevant labor market. This is one of the strengths of the Consent Decree. The number of remedial promotions exactly matches the number of promotions lost by black and hispanic police officers. For example, on the September 23, 1982 Sergeant examination, the statistical analysis showed that hispanics did not suffer any adverse impact. Consequently, the hispanics were not given any remedial promotions based on this exam.

As previously stated, the relevant labor market that was used in this case was the number of minority police officers who took the promotional examinations. Unlike, other race-conscious plans which have not passed constitutional muster because they inappropriately compare the number of minorities in a specific position, regardless of the level of skill required for that

37

position, with the number of minorities in the general labor force, the Consent Decree makes its comparison solely with the number of minorities in the police department. Clearly, the number of minority police officers who took the exam is the relevant labor market.[13] Once the remedial promotions are made, the promotional relief ends, regardless of the percentage of blacks and hispanics in the Sergeant and Lieutenant ranks.

*Impact upon Third Parties*

The impact upon third parties is a major aspect of this Consent Decree. A state or local government may constitutionally require innocent nonminorities to share the burden of remedying the effects of past identified discrimination. *See Fullilove v. Klutznick,* 448 U.S. 448, 484, 100 S.Ct. 2758, 2777, 65 L.Ed.2d 902 (1980).

It is evidently clear that the impact upon the nonminorities is negligible. The Consent Decree does not impose an absolute bar to the promotion of nonminorities. *See Paradise,* 480 U.S. at 184, 107 S.Ct. at 1073. More importantly, all the remedial promotions will be to newly created positions by the City of Houston. In no way are the nonminorities hurt by this Consent Decree. The nonminorities will be able to compete for exactly the same number of promotions that would exist in the absence of the Consent Decree. Their expectations and promotional opportunities are left fully intact.

---

[13]Again, we do not reach the issue of whether the number of minorities who took the exam is the only relevant labor market.

38

As the district court stated in its opinion on denial of intervention for appeal:

> The remedial promotions will be to positions that the city would not have otherwise created, leaving the non-class officers the same number of promotions that they would have had in the absence of the decree. The movants could have claimed, but did not, that they should be allowed to compete as equals for every position the city creates whether it would have otherwise under current city policy. The city could not create an additional set of officer positions and gratuitously reserve them for blacks, women, or East Europeans. The positions created by the consent decree and the partial reservation are predicated on an established history of abuse, not on a claim to quotas or sensitivity to ethnicity in gross.

As to the HPPU appellants' fears that people who scored lower on the promotional exams will be promoted before their members with higher scores:

> Their objections reflect confusion, at best. All of the examinations will be re-scored. The union members must compete fairly for promotions; they do not have a vested interest in continuing to receive the benefits of past discrimination.

The Airport police also cannot claim that the Consent Decree harms their ability to be considered Class A officers or to be merged with the Class A officers of the Houston Police Department. The District Court of Harris County, Texas has specifically ordered:

> IT IS, THEREFORE, ORDERED ADJUDGED AND DECREED that members of the Houston Police Department Specialized Police Division, Park Police, of the City of Houston, Texas be denied entry into the uniformed and Detective Class, (Class "A") of the Houston Police Department except by application, qualification, and entry at an entry level position.

Based on the factors outlined by the Supreme Court in *Paradise,* we find that the Consent Decree is narrowly tailored.

Therefore, we conclude that the Consent Decree is valid under

39

the Equal Protection Clause of the Fourteenth Amendment.

C.

Finally, we must answer the appellants objections which did not fall under traditional Title VII or Equal Protection Clause analysis. The Consent Decree's use of "log-linear" analysis to eliminate racially biased test items does not violate § 703(*l*) of the Civil Rights Act of 1964, as amended by § 106 of the Civil Rights Act of 1991. That section was intended to prevent the manipulation of test scores on valid employment-related tests. This provision is not applicable to the promotional tests at issue, because there is substantial doubt as to their job-relatedness.

In response to the *Comeaux* appellants' objections, the district court found that it would be unreasonable to delay or cancel the proposed relief for persons who actively sought to press their rights, in favor of persons who did not press their rights. As the appellees point out, the *Comeaux* appellants have not proffered any evidence that the failure of prosecution was exclusively the fault of their counsel.

The district court aptly stated that there can be little doubt that the federal courts have the power to enter an order overriding provisions of State or local law, where necessary, to provide an appropriate remedy in a settlement of a case in which the plaintiffs are alleging a violation of Federal law. However, the district court must take care that the provisions of State or local law are overridden only insofar as it is reasonable and appropriate to the remedy in question. *United States v. City of*

40

*Chicago,* 549 F.2d 415, 437-38 (7th Cir.), *cert. denied sub nom.,*
*Arado v. U.S.,* 434 U.S. 875, 98 S.Ct. 225, 54 L.Ed.2d 155 (1977).
We agree with the district court that the Consent Decree impinged
as little as possible upon the provisions of State law.

We conclude that the Consent Decree is valid under Title VII,
the Equal Protection Clause of the Fourteenth Amendment, and all of
the appellants objections.

Therefore, we affirm the district court's approval of the
Consent Decree.

### III. CONCLUSION

We find that the district court appropriately denied the
appellants' motions to intervene in the underlying case on the
basis of untimeliness.  Accordingly, we DISMISS those appeals.  We
REVERSE the district court's denial of the appellants' motions to
intervene for purposes of appeal.  Since we reach the appellants'
arguments as to the validity of the Consent Decree, and AFFIRM the
district court's approval of the Consent Decree, the district
court's denial of the motions for purposes of appeal is harmless
error.  Furthermore, since we have affirmed the district court in
the entering of the Consent Decree and have held that the district
court's denial of the motions to intervene for purposes of appeal
is harmless error, the court below is AFFIRMED in all respects.[14,15]

[14]The dissent accused the author of "extrapolation" of the
record to get to the finding that the district court denied the
intervention on the ground of untimeliness.  All one has to do is
read the briefs of the appellants who tried to intervene and they
all admitted that their intervention was denied on grounds of
untimeliness and they argued as to why their motions to intervene
were not untimely.  If the dissent wants to be blind to what the

41

PARKER, Circuit Judge, specially concurring,

While concurring with the majority opinion, I write separately to address some of the concerns expressed in the dissent.

The dissent professes surprise that the City would buy into the fundamental premises of the Plaintiffs' case and is deeply troubled by what the dissent characterizes as a decision of the City to use a consent decree from the federal court as a crutch to achieve what it could not accomplish as a matter of its own independent decision making. Whether we, as judges, favor these types of controversies or not, whether we might have made different decisions if we had been a party, whether or not we lament the political process that on occasion produces consent decrees in civil rights cases is of no consequence. The fact is that the parties decided to settle this case.

---

appellants say on the issue, I have no control over that.

[15]I wish to thank my co-panelist Judge Parker for his concurring opinion and coming to the defense of the opinion which he says he agrees with. I specially thank him for discussing the question of jurisdiction which the dissent seems to think we did not have in this case.

I have never had any question in my mind about the court having jurisdiction. The appellant police organizations in this case, while not allowed to intervene, participated in the "fairness hearing" provided by the 1991 amendments to the Civil Rights Act as objectors to the Consent Decree. The statute that allowed them to appear as objectors made them parties and, after the "fairness hearing", if they were not satisfied with what the court had done with the Consent Decree they had a perfect right to appeal. They did not have to ask permission from anyone. The statute made them parties. Appeal they did and we heard their objections to the Consent Decree, but affirmed the court below because the court had done the right thing in approving the Consent Decree entered into between the class and the City of Houston.

42

This nineteen year old litigation was settled in a manner that provided a limited and narrowly tailored remedy that responded to the wrongs associated with the testing provisions for advancement within the Houston Police Department. The testing provisions effectively limited advancement opportunities for blacks and hispanics. The consent decree provides remedial positions available to the group of officers adversely affected by the old testing procedures. The narrowness of the settlement is further evidenced by the fact that the consent decree takes no jobs away from non-class members and imposes no duties or responsibilities on them. The consent decree does exclude non-class members from competition for 106 remedial promotions with remedial seniority, but the remedial promotions will not prevent non-class members from being promoted on regular promotion schedules, and there will be no demotions or layoffs in order to make remedial promotions possible. Based on the total aggregate promotions to sergeant and lieutenant from 1982-91, remedial promotions would only account for about 287 of the total promotions available over the five year period of remedial promotions, or 147 of the total promotions over the life of the consent decree. While these remedial promotions do have a limited effect on promotional opportunities of non-class members, it is difficult to imagine any remedial scheme that would not have some effect. The leveling of the playing field for black and hispanic officers does not unduly trammel the interests of officers who are not members of the plaintiff class.

Our role is not to delve into the propriety of the decisions

43

that resulted in the settlement but to address the legal issues presented in this appeal. The issues in this case are straightforward. They are (1) whether there is some procedural or jurisdictional impediment to our reaching the merits, and, if not (2) whether the district court erred in approving the consent decree.

It is entirely proper for this Court to consider the merits of the consent decree once it finds that a motion to intervene was improperly denied. Under the "anomalous rule" governing the appeal of orders denying intervention in this Circuit, the Court has provisional jurisdiction to determine whether the district court erroneously concluded that Appellants were not entitled to intervene, and if it determines that the district court properly denied intervention, appellate jurisdiction evaporates and the case is dismissed; however, if the district court was mistaken, the appellate court retains jurisdiction and reverses. *Stallworth v. Monsanto Co.,* 558 F.2d 257, 263 (5th Cir.1977). But our reversal of the district court's denial of a motion to intervene does not end our review. If intervention was improperly denied, it is incumbent upon us to determine whether that denial was harmless error. *See, e.g., Meek v. Metropolitan Dade County,* 985 F.2d 1471 (11th Cir.1993) (affirming on the merits after reversing the district court denial intervention); *In re Grand Jury Proceedings in Matter of Freemen,* 708 F.2d 1571, 1575 (11th Cir.1983) (per curiam) (holding that failure to permit intervention was harmless where the appellate court "considered [the defendants'] claim ...

44

as if the district court had allowed them to intervene");
*Washington State Bldg. & Constr. Trades Council v. Spellman,* 684
F.2d 627, 630 (9th Cir.1982) (holding that improper denial of
motion to intervene did not require a new trial where proposed
intervenor was permitted "to participate in the argument on the
appeal from the order granting summary judgment, and its conditions
were duly considered"), *cert. denied* 461 U.S. 913, 103 S.Ct. 1891,
77 L.Ed.2d 282 (1983); *Halderman v. Pennhurst State School &
Hospital,* 612 F.2d 131, 134 (3rd Cir.1979) (applying harmless-error
analysis to denial of motion to intervene for the purpose of
appealing).

Assuming the district court acted within its discretion in
denying as untimely Appellants' initial motions to intervene,[1]

[1]According to the dissent, "this case was still early in its
normal procedural history and that there is no question that the
motions to intervene were timely under "all the circumstances.' "
Dissent at 11-12. The dissent's characterization of the
procedural posture of this case ignores the fact that this
litigation had reached the point where it was obvious to all
concerned that the parties intended to settle the case. While
the motions to intervene might have been filed early in the
procedural history of this case if this case had a more
conventional procedural history and it were actually going to
trial, they were filed very late in the game in the case of this
consent decree.

     The Supreme Court addressed a similar situation in
*NAACP v. New York,* 413 U.S. 345, 366-69, 93 S.Ct. 2591,
2603, 37 L.Ed.2d 648 (1973). In that case, the State of New
York filed action seeking declaratory judgment that its
literacy tests had not been used for the purpose or with the
effect of denying or abridging the right to vote based on
race or color. In *NAACP,* the appellants filed their motions
to intervene just four days after the United States filed
its consent to the entry of declaratory and seventeen days
after learning of the pendency of the action. A three judge
panel denied NAACP's motion to intervene and granted summary
judgment to State of New York. Supreme Court upheld denial

45

Appellants still have a sufficient interest to have a right to appeal the decision of the district court, and it was an abuse of discretion to deny intervention for purpose of appeal. The district court's denial of Appellants' motions to intervene for the purpose of appeal cannot be sustained on the grounds of untimeliness. First, as noted in the majority opinion, the motions were filed at the invitation of the district court within the time frame for such motions set up by the district court. Second, although the initial motions to intervene were untimely under *Stallworth,* the *Stallworth* analysis does not lead to the same result with respect to the denial of the motions to intervene for appeal.

The second *Stallworth* factor requires that we consider the prejudice to existing parties if the appellants intervention is allowed. *See Stallworth,* 558 F.2d at 265. In the context of a Rule 24(a) intervention as of right, the only prejudice that we consider is that prejudice caused by a would-be intervenor's delay

---

of intervention as untimely despite the early stage of the litigation.

In the instant case, the underlying litigation had been going on for almost twenty years. The earliest of the motions to intervene were filed three months after Chief Nuchia issued a departmental circular to all police officers informing them of the potential settlement of the lawsuit and 37 days after the district court published notice of the terms of the consent decree. Under all the circumstances of this case, the district court did not abuse its discretion in denying Appellants' initial motions to intervene as untimely.

in filing its motion to intervene.[2]  Since Appellants moved to intervene for the purpose of appeal only and did not raise any issues that were not presented to the district court, it does not appear that the delay in filing their motions could have prejudiced the existing parties.  *Cf. McDonald v. E.J. Lavino Company,* 430 F.2d 1065 (5th Cir.1970) (holding that, although post-judgment motions to intervene are normally viewed with a "jaundiced eye," the timing of post-judgment motion to intervene for the limited purpose of staking a claim to the proceeds of suit could not prejudice existing parties).  The existing parties would have been

---

[2]The dissent argues that the second *Stallworth* factor, prejudice to the existing parties, has no significant application in the case of a Rule 24(a) intervention.  This flies in the face of the clear language of *Stallworth.*  *Stallworth* does not say that prejudice to the parties is not a factor in a Rule 24(a) intervention, it says that, in the case of a Rule 24(a) intervention, prejudice *other than that caused by the delay* is not considered.

   The dissent paraphrases a statement in *Stallworth* that "to take *any* prejudice that the existing parties may incur if intervention is allowed into account under the rubric of timeliness would be to rewrite Rule 24 by creating an additional prerequisite to intervention as of right." *Stallworth,* 558 F.2d at 265.  The dissent completely changes the meaning of this sentence by omitting the emphasis on "any.'  *See* Dissent at 694.  The dissent ignores the sentence immediately preceding sentence which says that "it is apparent that prejudice to the existing parties other than that caused by the would-be intervenor's failure to act promptly was not a factor meant to be considered where intervention was sought under section (a)."  *Stallworth,* 558 F.2d at 265.

   The dissent's complaint that the majority fails to distinguish between permissive intervention under Rule 24(b) and intervention as of right under Rule 24(a) with respect to the application of this factor completely ignores the fact that the majority only considered prejudice resulting from the Appellants' delay in filing their motions to intervene.

47

in exactly the same situation if Appellants had filed their motions to intervene for appeal only on the day this case was filed.

Perhaps more importantly, 42 U.S.C. § 2000e-2(n) creates an "unusual circumstance" under the fourth factor of the *Stallworth* analysis. Under 42 U.S.C. § 2000e-2(n), if Appellants were denied entirely the right to intervene in this action, they would be precluded from raising any challenge to the consent decree. The fact that the district court initially denied Appellants motions to intervene without prejudice to refiling for the purpose of appeal removed the effect of 42 U.S.C. 2000e-2(n) from the "unusual circumstances" in factor four of the *Stallworth* test. *Cf. NAACP v. New York,* 413 U.S. 345, 368, 93 S.Ct. 2591, 2605, 37 L.Ed.2d 648 (1973) (absence of special circumstances warranting intervention illustrated by the fact that appellants were free to renew their motion to intervene following the entry of summary judgment). However, when the district court denied Appellants' motion to intervene for appeal, it foreclosed the possibility of any further challenge or appellate review of the consent decree. This altered the balance of the *Stallworth* factors to the extent that it was an abuse of discretion to deny Appellants motions to intervene for the purpose of appeal.

If, as the dissent contends, intervention for the purpose of appeal were not permitted by the Rules,[3] it would have been error

---

[3]The dissent contends that there is nothing in the Rules of Civil Procedure which contemplates a motion at the trial court level to intervene for appeal purposes only, so the denial of such an intervention cannot authorize us to reach the merits of Appellants' claims. However, while it is true that intervention

48

for the district court to deny Appellants' initial motions to intervene because of 42 U.S.C. § 2000e-2(n)'s effect on the fourth *Stallworth* factor. We would still reach the merits of Appellants' claims.

The district courts' denial of Appellants' motions to intervene for the purpose of appeal had no practical effect on their ability to present their positions on appeal. Although Appellants' motions to intervene for the purpose of appeal were denied, Appellants did present their objections to the consent decree to this Court. Though not "allowed" to participate in the appeal by the district court, Appellants did participate in the argument on appeal and presented their objections to the consent decree to this Court, and their arguments were duly considered.

Appellants' situation with respect to the proceedings before the district court was similar. Appellants had their day in court; they had the amount of process they were due. The dissent's view of what constitutes one's "day in court" would preclude consent

---

for the purposes of appeal only does not appear in the text of Rule 24, it does appear in the case law. *See, e.g., United Airlines, Inc. v. McDonald,* 432 U.S. 385, 395-96, 97 S.Ct. 2464, 2470-71, 53 L.Ed.2d 423 (1977) and the cases cited therein at n. 16.; *see also* C. Wright, A. Miller & M. Kane, 7C *Federal Practice and Procedure* § 1923, at 517 (2d ed. 1986).

The dissent also contends that there is nothing in the newly enacted amendments to the Civil Rights Act which evidences an intention to create an appeal from the fairness hearing. While this too is true as far as it goes, it ignores the fact that 42 U.S.C. 2000e-2(n)(2)(A) explicitly provides that those amendments shall not be construed to alter the standards for intervention under Rule 24. So 2000e-2(n) cannot preclude an intervention procedure that would otherwise be permissible.

decrees and would apparently mandate that these type cases all be tried. The dissent's position appears to be that if one attains the status of intervenor, then he can effectively thwart any consent decree by being entitled to discovery, the presentation of evidence and witnesses, the right to a decision by a judge or jury, and the right to appeal. Such a narrow view of fairness hearings in the context of consent decrees is without discernable authority.

Appellants have no substantial grounds to complain regarding their participation in the fairness hearing. If Appellants had been granted intervenor status they would have been entitled to present evidence and have their objections heard at the hearings on whether to approve a consent decree, but they would not have the power to block the decree merely by withholding their consent. *Local Number 93, International Asso. of Firefighters, etc. v. Cleveland,* 478 U.S. 501, 529-30, 106 S.Ct. 3063, 3079, 92 L.Ed.2d 405 (1986). Although Appellants were not technically permitted to intervene in the district court action, they were allowed to introduce evidence and cross-examine witnesses at the fairness hearing. Appellants were permitted to air their objections to the reasonableness of the decree and to introduce relevant evidence; the district court considered these objections and explained why it was rejecting them. *See Cleveland,* 478 U.S. at 529, 106 S.Ct. 3079. Neither intervenors nor objectors are entitled to hold consent decrees hostage and require a full-blown trial in lieu of a fairness hearing. The issue here is how much process appellants were due. Even if appellants had been designated as intervenors,

they still got the process they were due.

The district court afforded Appellants de facto intervenor status at the fairness hearing and found their objections unconvincing. Appellants have not shown that the district court was wrong or that they would have been any more convincing at the fairness hearing if they had been designated intervenors rather than objectors. Appellants suffered no prejudice by the district court's failure to designate them intervenors apart from denying them their right of appeal on the merits. We have remedied that error.

For the reasons set out in the majority opinion and in this special concurrence, I agree with the majority that we have jurisdiction to review the merits of Appellants' claims. After conducting such a review, I agree that any error in denying Appellants' motions to intervene was harmless. Although I agree that the district court acted within its discretion in denying Appellants' initial motions to intervene, I do not believe that that determination is critical to the outcome of this case; if the initial motions to intervene were improperly denied, I would reach the same result.

DeMOSS, Circuit Judge, dissenting:

With some of the trepidation that I suspect was in the mind of David when he stepped forward to face Goliath, I write to express my dissent and disagreement with the analysis and conclusions reached by my distinguished colleagues in the foregoing opinion.

I disagree with the panel majority's extrapolation from the

51

record that the district judge denied the motions for intervention because of "untimeliness." In my view, if the district judge articulated any reason for his denial of the motions for intervention, it was because he felt that the right to object at the fairness hearing was all he was obligated to afford to the would-be intervenors.

I dissent and disagree with the majority panel conclusion that the district judge's denial of the motion for intervention because of "untimeliness" was not clearly erroneous. In my view, such a ruling is clearly inconsistent with and not supported by any prior case law nor by an appropriate construction of the newly adopted amendment to the Civil Rights Act which speaks to this question.

I dissent and disagree with the panel majority's conclusion that denial of a motion to intervene "for appeal only" is a final judgment which vests this court with appellate jurisdiction, when a prior motion to intervene in the main case has been denied and sustained on appeal by the court. In my view, there is nothing in the Federal Rules of Civil Procedure which contemplates a motion at the trial court level to intervene for appeal purposes only and there is nothing in the newly enacted amendment to the Civil Rights Act which evidences an intention to create an appeal from the fairness hearing.

Some history is necessary to put this case and my dissent in perspective. Prior to the Supreme Court's decision in *Martin v. Wilks,* 490 U.S. 755, 109 S.Ct. 2180, 104 L.Ed.2d 835 (1989), most federal courts of appeal had adopted a very restrictive rule

precluding all challenges or collateral attacks on a Title VII consent decree once it had been entered by a court.[1]  These courts concluded (i) that the effectiveness of such decrees as a mechanism to settle claims short of or early in the litigation process would be substantially undermined, if not eliminated, if the decrees were subject to perpetual challenge;  and (ii) that such decrees have played a beneficial role in providing relief to thousands of victims of systemic employment discrimination.[2]  However, in *Wilks,* the Supreme Court, in rejecting the "impermissible collateral attack doctrine" of the circuit courts, found that (i) one of the clear principles of Anglo-American jurisprudence is "that one is not bound by a judgment in personam in a litigation in which he is not designated as a party or to which he has not been made a party by service of process;"  (ii) that one of the rules deeply rooted in our historic tradition is "that everyone should have his own day in court;"  and (iii) that the law does not impose on anyone the burden of voluntary intervention in a suit to which he is a stranger;  and that "[u]nless duly summoned to appear in a legal proceeding, a person not a privy may rest assured that a judgment recovered therein will not affect his legal rights." *Wilks,* 490 U.S. at 762, 109 S.Ct. at 2184-85.  As the Supreme Court recognized, both FRCP 24(a) covering intervention as a matter of

---

[1] *See, e.g., Thaggard v. City of Jackson,* 687 F.2d 66 (5th Cir.1982), *cert. denied sub nom., Ashley v. City of Jackson,* 464 U.S. 900, 104 S.Ct. 255, 78 L.Ed.2d 241 (1983);  *Dennison v. City of Los Angeles Dep't of Water & Power,* 658 F.2d 694 (9th Cir.1981).

[2] *See Thaggard,* 687 F.2d at 69.

right, and 24(b) covering permissive intervention, are cast in "permissive terms."[3] Concerns for finality and completeness of judgments are "better [served] by [the] mandatory joinder procedures" set forth in Rule 19(a). *Id.* Finally, "the linchpin of the "impermissible collateral attack doctrine'—the attribution of preclusive effect to a failure to intervene—is therefore quite inconsistent with Rule 19 and Rule 24." *Id.* at 764, 109 S.Ct. at 2186.

The U.S. Congress, however, concluded that the Supreme Court had gone too far in *Wilks,* which in effect required mandatory joinder of all parties whose interests could potentially be affected, and the Congress therefore set upon the task of devising a remedial scheme which would "balance the rights of non-litigants against the need for finality of judgments and prompt relief for discrimination." H.R.Rep. No. 40(I), 102d Cong. (1991), *reprinted in,* 137 Cong.Rec. 588 (1991), U.S.Code Cong. & Admin.News 1991, 549, 588. That balance is best achieved when all interested parties are allowed to participate in a single proceeding. As the Judiciary Committee stated:

> [T]he *Wilks* decision imposes inefficient and inequitable rules on Title VII litigation. Once an employment dispute has reached the courts, the parties, all non-litigants with a stake in its outcome, and the public have a strong interest in bringing the litigation to an expeditious end. *Thus, all related interests and claims should ordinarily be adjudicated in one proceeding.* (emphasis added). H.R.Rep. No. 40(I),

---

[3]*Id.* at 763, 109 U.S. at 2185; *see,* FRCP 24(a) (intervention as of right) ("Upon timely application anyone shall be permitted to intervene"); FRCP 24(b) (permissive intervention) ("Upon timely application anyone may be permitted to intervene").

102d Cong., *reprinted in* 137 Cong.Rec. 591 (1991), U.S.Code Cong. & Admin.News 1991, 591.

To accomplish this goal Congress passed Public Law 102-166 Section 108, which is now codified at 42 U.S.C. § 2000e-2(n) and became effective January 21, 1991.

*Subsection n(1)* defines the circumstances under which subsequent challenges to a consent decree will be precluded. It is similar in content to the pre-*Wilks* case law, although it imposes some new requirements (i.e., "actual notice of the proposed judgment") which were not requirements of that prior law.

*Subsection n(2)* sets forth the various circumstances in which subsequent attack on a Title VII consent decree will not be precluded. Congress expressly stated its intent to include all relevant parties in Subsection n(2)(A) which provides that nothing in the Subsection is intended to "alter the standards for intervention under Rule 24." Although the majority opinion makes no mention of the effect these amendments, I believe that we should reconcile and address their effect on this suit.

With this general legal background in mind, I need to add some comments about this particular lawsuit. It is a "disparate impact case" and not an "intentional discrimination case." It was filed August 19, 1992. As the majority opinion indicates, two previously existing lawsuits, *Kelly* and *Comeaux* were consolidated into this case. *Kelly,* filed in 1975, and *Comeaux,* filed in 1976, both included assertions of disparate impact similar to those in the current case. The City of Houston filed an answer in this case on September 30, 1992, and denied generally the allegations of

55

disparate impact in this case, just as it had done in the prior cases of *Kelly* and *Comeaux*.  The disparate impact is alleged to occur "in racially discriminatory promotional examinations for the ranks of sergeant and lieutenant in the Houston Police Department." The plaintiffs sought certification by the trial court of two classes of plaintiffs, African American and Hispanic American members of the police department who took examinations for sergeant and lieutenant during the years in question.  As I understand the record, the process for promotion in the Houston Police Department consists of the following steps:

1. The police officers who have served a defined number of years in a lower grade are eligible to take the examination for promotion to a higher grade.

2. The officers who take and pass the promotional examination with at least the established passing grade are eligible for promotion.

3. All eligible officers are then placed in rank order on a list of those eligible for promotion in accordance with the sum of:

    a. their actual score on that examination, plus

    b. additional points, based on their years of service with the police department.

4. As vacancies occur (resulting from death, withdrawal, retirement, resignation, or from expansion of the force by action of the City Council) these vacancies are filled from the top of the list of eligibles downward until all vacancies are filled.

This system produces the following general results:

1. Individual police officers who make the highest scores on the examination and have the largest number of points for years of service are the first ones to be promoted;  and

2. The number of promotions actually made is a function of the number of vacancies and not the number of eligibles on the list.

The plaintiffs tendered various statistical studies which showed that comparing "test takers" and "numbers of promotions" for each of the categories of whites, blacks, and hispanics, there was a variation in promotion rates for blacks and hispanics sufficiently large to rule out chance as the determining factor, and therefore there was an adverse discriminatory impact. This adverse impact was attributed by plaintiffs to certain questions (not identified either by number or by content) on the examinations, which blacks and hispanics were alleged to have answered incorrectly more frequently than whites. However, in my judgment, the theory upon which the plaintiffs plead and supported their claims (as indicated by paragraphs 24-39 of the findings of fact and conclusions of law which the plaintiffs prepared and persuaded the trial judge to sign in this case) suffer two fundamental conceptual breakdowns which render their claims questionable:

A. First of all, to prove "disparate impact" in the giving and taking of an examination, one must compare "test takers" and "test passers." Not only did the plaintiffs not proffer any statistical testimony based on this comparison, they alibied out of the task (and got the district court to sign a finding) on the grounds that the expense of making such a determination was prohibitive.

B. Secondly, to prove "disparate impact" in the promotion system used by the city, you must compare the number of individuals eligible for promotion with the number of individuals actually promoted in each of the racial categories.

As I explained earlier, to be eligible for promotion, each police officer, of all racial categories, must achieve the same minimum score; and it is important to note in this case that there is no contention that the minimum passing score for blacks and/or hispanics was any different from that for whites. But in their

57

statistical data, for purposes of comparison with the actual promotions in each minority category, the plaintiffs utilize a concept of "availability" (the percentage of blacks and hispanics of all *test takers* ) as the starting point for determining a concept of "expected promotions" (the number of minorities who would be promoted if you applied the "availability" percentage to the total number of actual promotions of all categories.) Clearly, in my judgment, the factor of "available percentage" should have been determined by determining the percentage of each minority category of all "test passers" (not *test takers* ) and the number of "expected promotions" would then be the percentage attributable to each minority group which were eligible for promotions as applied to the total number of promotions actually made.

If the statistical data incorporated in the findings of fact was the same data presented to the City of Houston in the settlement negotiations, I am genuinely surprised that the city would buy into the fundamental premises of the plaintiffs' case. Obviously, the city had faced similar "disparate impact" contentions in the *Kelly* and *Comeaux* cases for more than ten years, and had consistently declined to recognize the validity of such contentions. The net results of the plaintiffs' claims and the city's capitulation thereto, is a determination of a "short fall" in promotions to each of the minority groups and a determination to award "remedial promotions" to each of these minority groups on the basis of such "short fall." There is, however, no evidence or findings which can determine any individual as to which these

58

remedial promotions should be granted. In fact, under the consent decree, these promotions will be awarded to whomever the city chooses from among the two minority groups. I am deeply troubled by the decision of the city to use a consent decree from the federal court as a crutch to achieve that which it could not accomplish as a matter of its own independent decision making, i.e., expand the composition of the police department by 96 new sergeants slots and award those slots on the basis of race.

At about this point, various other groups of police officers sought to intervene in this case. Some of these groups are representative of other minorities, i.e., women and Asians. Others of these groups represent associations and unions of police officers. Some of these groups sought to intervene as plaintiffs, alleging that they too had been victims of "disparate impact" in the promotion process and that they should be entitled to share in the assignment of the new sergeant and lieutenant slots authorized by the city council. Other groups sought to intervene, in effect on the side of the City of Houston, as defendants, asserting that the examinations given for promotions were legitimate "job related" examinations, and consistent with the "business necessity" and professional desire to see that the most qualified individuals were promoted to positions of leadership. Some of these latter groups plead and proffered testimony that would show that the statistical data upon which plaintiffs contended "disparate impact" had occurred was flawed in concept or factually insupportable. And these contentions bring us to what I consider to be the "gut" issue

59

in this lawsuit, i.e., "Did the trial court properly dispose of these motions to intervene?"

The trial court set a hearing to consider the motions to intervene. This hearing began at 9:30 a.m., continued without a recess, and concluded after generating only 65 pages of transcribed testimony. Approximately the first 30 pages of this transcription set forth a dialogue between the trial judge and plaintiffs' counsel regarding the nature and content of plaintiffs' asserted discrimination claims and the remedy provisions of some of the aspects of the proposed consent decree. About mid-way through the hearing, counsel for one of the would-be intervenors (the Houston Police Patrolmen's Union) asked the court to direct its attention to the issue of intervention, which was the purpose of the hearing, and twice advised the court regarding the applicability of 42 U.S.C. § 2000e-2(n) as it relates to the subject of intervention. The trial court, however, ignored such references to subsection (n). Furthermore, at this hearing, supposedly on the subject of intervention, the court made no reference to Fed.R.Civ.P. 24(a), 24(b) or to any of the factors relating to the subject of intervention under those rules. There was no mention of the *Stallworth* case, nor the four factors for determining a question of timeliness thereunder. At the conclusion of the hearing, the court announced its ruling from the bench as follows:

> The motions to intervene are denied without prejudice to them being reasserted after the objections are heard for purposes of appealing the decision itself as opposed to any ruling of the preparation of this issue. [sic]

Three days after the intervention hearing the district judge

filed a "order on intervention" which read, in its entirety, as follows:

1. The motions to intervene in this case as full active parties representative by women, Asians, the airport police and park police, and by Houston Police Patrolmen's Union and Park Police Association are denied.

2. The court will consider motions to intervene for purposes of appeal. These motions must be filed by April 19, 1993.

The district judge did not file any memorandum opinion supporting this "order on intervention." Notices of appeal from the denial of the motions to intervene were timely filed within 30 days after the entry of such order. These notices of appeal were docketed under Appeal No. 93-2315 of this court.

As we begin the task of assessing the propriety of the trial court's denial of the motion to intervene, and particularly the issue of "timeliness" which is at the heart of that determination, I think it is imperative to have a clear sense as to the procedural posture of the main case when the motions to intervene were filed. The intervention motions were essentially filed on or around March 12, 1993. As of that date, the original parties, (i.e., the plaintiffs and the defendant City of Houston):

A. *Had not* filed any proposed order determining the class or classes to be certified pursuant to Rule 23(c) even though subpart (1) of that rule states that such action would be taken "as soon as practicable after the commencement of an action brought as a class action;"

B. *Had not* entered into any scheduling order under Rule 16 establishing time tables for "joinder of parties, amendment of pleadings, or completion of discovery" as contemplated by that rule;

C. *Had not* engaged in any discovery activities or taken any deposition pursuant to notices filed under Rule 26;

61

D. *Had not* conducted any pretrial conferences for the purpose of establishing a trial date; and

E. *Had not,* obviously, undertaken any steps to implement any of the changes or procedures contemplated by the proposed consent decree.

As this court stated in *Stallworth,* "timeliness is not limited to chronological considerations but "is to be determined from all the circumstances.' "  *Stallworth v. Monsanto Co.,* 558 F.2d 257, 263 (1977) (quoting *United States v. United States Steel Corp.,* 548 F.2d at 1235).  Viewed in the light of "all the circumstances" I would say that this case was still early in its normal procedural history and that there is no question that the motions to intervene were timely under "all the circumstances."  The City of Houston filed its answer on September 30, 1992, approximately 40 days after the plaintiffs filed their original petition.  In that answer, the City of Houston, as defendant, denied the essential elements of the plaintiffs' claim, called on the plaintiffs to prove "disparate impact," and tendered proof by the city in support of the business necessity of the promotional examinations.  The docket sheet of the court reflects absolutely no entries of any kind after September 30, 1992, until November 19, 1992, when the parties filed a consent order on "confidentiality of documents," which order was finally signed and filed on December 14, 1992.  The next significant entry on the court's docket was January 20, 1993, indicating a memorandum of a telephone conference which made arrangements for the preparation of a notice form to be sent out and established preliminary time tables for the return of objections and a pretrial conference.  Consequently, for a period of almost four months, from

the date of the city's answer on September 30, 1992 to the entry of the conference memorandum on January 20, 1993, there were no docket entries on the registry of the court which would have given any third party who might be interested in the status of this case any real substantive clue as to what was going on. During this time, of course, the plaintiffs and the City of Houston initiated private settlement discussions (sometime in late November) and Chief Nuchia sent out his circular to the police department on December 16. (*See* n. 8 of majority opinion, *supra.*) However, it is evident from Chief Nuchia's December 16th circular both that the consent decree was not a done deal and that the details had not been released. The panel majority attribute great significance to this December 16th circular which I am not inclined to give, primarily because of the tentative and preliminary nature of the information contained therein. But, even assuming that it was sufficient notice to start some "timeliness" clock ticking against the would-be intervenors, the would-be intervenors took no more time to ultimately file their motions to intervene than it took the city and plaintiffs to arrive at some preliminary concept of a consent decree. The panel majority admits that this time interval by itself "would probably not merit a finding of untimeliness" but it nonetheless affirms the trial court by relying principally on the second and third factors of the *Stallworth* analysis.

*Stallworth's* second factor relates to the prejudice which might result to existing parties. As *Stallworth* makes absolutely clear, such determination of prejudice as to existing parties is

applicable primarily to motions for intervention under Rule 24(b) (permissive intervention) and has very limited application to motions for intervention under Rule 24(a). *Stallworth,* 558 F.2d at 265. This is because the language about prejudice to existing parties exists only in the language of Rule 24(b). Therefore, to take into account any prejudice that the existing parties may incur if intervention were allowed as part of the rubric of timeliness would be to rewrite Rule 24(a) by creating an additional prerequisite to intervention as of right. *Id.*

This is precisely what the majority does in their opinion. Amazingly they cite *Corley v. Jackson Police Dep't* as authority for that conclusion. In *Corley* the motion to intervene was filed some four years after entry of the consent decree and after implementation of the consent decree, neither of which circumstances exist in this case. *Corley v. Jackson Police Dep't,* 755 F.2d 1207 (5th Cir.1985). Furthermore, although the would-be intervenors in this case sought to intervene under both Rule 24(a) and Rule 24(b), the majority does not even mention the distinction clearly established by *Stallworth* between those two rules on the subject of prejudice to the existing parties.[4]

Likewise, when we turn to *Stallworth's* third and fourth

---

[4]In essence what the majority opinion and the special concurring opinion would establish as precedent for cases involving consent decrees is a rule that once the original parties to the litigation agree on the terms and conditions of a consent decree and issue the notices required by subsection (n), any attempt by a third party to intervene is untimely as a matter of law. In my view, that just cannot be what Congress intended by the adoption of subsection (n).

timeliness factors, I think the trial judge and the panel majority completely missed the boat. The boat in this case is the significant impact which subsection (n) brings to the table of discussion about timeliness. The panel majority dismisses factor 4 by simply concluding that there were no unusual circumstances. As to factor 3 the panel majority concludes that the would-be intervenors "had their day in court," stating, "there is no prejudice to the appellants [the would-be intervenors] because their participation in the fairness hearing in effect gave them all the rights they would have had they been made parties to the lawsuit." The majority reaches this conclusion without even mentioning the language of subsection (n) which obviously prejudices the would-be appellant's rights by foreclosing the possibility of subsequent challenge. Rather than sanction this result, Congress expressly tried to prevent it by encouraging inclusion of all interests in one proceeding. For example,

> *Subsection (n)(2)(A)* states that the *standards* for intervention under Rule 24 are not "altered" by (n)(1)(B), regarding notice and an opportunity to present objections; and

> *subsection (n)(2)(A)* also states that the *rights* of parties who have "successfully intervened," pursuant to Rule 24, are not altered by (n)(1)(B).

In my view these provisions contemplate that intervention could occur in the proceeding in which the notice and opportunity to present objections would occur under (n)(1)(B), otherwise there would have been no need to include the second part of (n)(2)(A).

Finally I note that there is nothing in subsection (n) which speaks to the rights of parties who have been denied intervention;

and there is nothing in subsection (n) which gives persons to whom notice and opportunity to present objections have been afforded under paragraph (1)(B) the right to appeal the entry of the judgment or order described in subparagraph (1)(A).

I submit that it is self evident from the face of the statute that the provisions for notice and an opportunity to present objections were not intended to take the place of intervention rights under Rule 24(a) or (b). If any legislative history is necessary to support this conclusion, I cite the following:

> A person wishing to challenge an employment practice that implements a court decree will thus retain the right under Rule 24 to seek to intervene in the proceeding in which the decree was entered and, the court will determine whether intervention is appropriate through reference to the principles that have developed under Rule 24. Similarly, the preclusion rules do not apply to the rights of parties who successfully intervene pursuant to Rule 24. H.R.Rep. 40(I), 102d Cong. (1991), *reprinted in,* 137 Cong.Rec. 597 (1991), U.S.Cong. & Admin.News 1991, 597.

Furthermore, in the same legislative history, the house committee report states as follows:

> They [the provisions regarding notice and a reasonable opportunity to be heard] advance the important goal of judicial finality by permitting all interests affected by a Title VII consent decree to be considered fully and fairly in a single proceeding, prior to entry of the decree. These provisions also embody the principle that third parties are best left to decide for themselves (after receiving sufficient notice) *whether to enter pending litigation, rather than being forcibly joined,* regardless of their wishes or intentions, as the *Wilks* rule requires. *Id.* at 594 (emphasis added).

Finally, the legislators specified that subsection (n) provides for the inclusion "of all reasonably ascertainable interested parties in a single proceeding" and precludes subsequent challenges "only where preclusion is consistent with due process."

66

*Id.* at 597.

Given the plain language of the statute and this legislative history, I submit that subsection (n) affords an individual who has received actual notice of a consent decree which might adversely affect his interests, three options.  They are:

A. He may do nothing, in which event he will be precluded from challenging the judgment or order;

B. He may elect to present his objections on or before the date set by the notice, in which event he has no right to appeal from whatever disposition the court makes of his objections, and he will be precluded from challenging the judgment ultimately entered;  or

C. He may move to intervene in the proceeding, in which event one or the other of the following results may occur:

1. If his motion to intervene is granted, he would be granted all of the rights of a normal party litigant therein, would not be precluded from asserting his rights under the Constitution or Federal Civil Rights Laws, would be afforded the right to appeal from the final judgment therein, and would be bound by principles of *res judicata* to the final judgment established therein;  or

2. If his motion to intervene is denied, he would have the right to appeal such denial as may be afforded under Rule 24;  and he may elect to participate or not participate in the opportunity to present objections, but in such latter event he would be precluded from challenging the judgment or order finally entered therein unless an appellate court determined that his motion to intervene was improperly denied by the trial court.

Under this analysis, the requirements of subsection (n) create special and unusual circumstances under *Stallworth's* fourth factor which requires that the timeliness of would-be intervenors' motions to intervene be assessed in light of the notice required under subsection (n)(1)(B).  Likewise, the assessment under *Stallworth's* third factor, the prejudice which the would-be intervenor will suffer if intervention is denied, should be assessed in light of

67

the preclusive effect which subsection (n) produces as a result of such denial. Courts have often rationalized denying intervention on the grounds that the would-be intervenors could later bring their own separate suit to assert their particular remedies. Under subsection (n) this will no longer be true. Consequently, in my view, the proper course for our trial courts to follow when faced with a motion to intervene in a Title VII proceeding, is to permit such intervention when the motion for intervention is filed prior to the entry of the final decree, and prior to the date set for response in the notices sent out under Paragraph (1)(B) of subsection (n). Such course of action is fully consistent with the statements of policy reflected by the legislative history quoted above and fully reconciles the two great policy considerations which motivated Congress to pass subsection (n). The majority's position, finding intervention untimely even when filed *before* entry of the consent decree and *before* the date for responses, is inconsistent with our well-established precedent and effectively forecloses meaningful participation by non-minority and other interested groups in Title VII litigation.[5] Such a bold departure

_____

[5]Our decisions finding intervention untimely have all involved motions filed well after entry of the consent decree. *See Corley v. Jackson Police Dep't,* 755 F.2d 1207 (5th Cir.1985) (intervention untimely when filed 50 months after consent decree entered); *Smith v. Missouri Pac. R. Co.,* 615 F.2d 683 (5th Cir.1980) (intervention untimely when filed 2 years after entry of judgment); *Hefner v. New Orleans Public Serv., Inc.,* 605 F.2d 893 (5th Cir.1979) (intervention untimely when filed two years after entry of judgment), *cert. denied,* 445 U.S. 955, 100 S.Ct. 1639, 64 L.Ed.2d 231 (1980); *United States v. Allegheny-Ludlum Indus., Inc.,* 553 F.2d 451 (5th Cir.1977) (intervention untimely when filed seven and one-half months after judgment), *cert. denied,* 435 U.S. 914, 98 S.Ct. 1467, 55 L.Ed.2d 505 (1978). Our

from precedent should at least be acknowledged and discussed by the majority.

Having disposed of the motions to intervene, the trial court moved on to conduct what has been euphemistically referred to as the "fairness hearing." This hearing occurred two days after the hearing on the motions to intervene, began at 9:00 a.m., had a lunch break, and was concluded at about 5:00 p.m. A large part of this hearing consisted of dialogue between counsel for the plaintiffs, the city, and the "objectors" and between those counsel and the court. In essence, the "hearing" consisted of a verbal rehash of the terms and conditions of the consent decree and the content of written objections which had been filed by many individuals and by the would-be intervenors. Some live testimony was presented by the police chief and by the statistical expert for plaintiffs. The court declined, however, to accept any live testimony tendered by an expert of HPPU, one of the would-be intervenors-objectors. The document labeled "Findings of Fact and Conclusions of Law" which contains 102 pages, and which the trial court signed and filed the next day, was pre-drafted apparently by the plaintiffs and was present, and frequently referred to, during the fairness hearing. In my view, this "fairness hearing" was nothing more than a drill to permit the district court to rubber stamp its approval of the pre-drafted findings of fact and

landmark decision in *Stallworth* found intervention *timely* when filed one month *after* entry of judgment. *See Stallworth,* 558 F.2d at 266. (The mere fact judgment has already been entered should not require that intervention be denied as untimely.)

69

conclusions of law, and ultimately the consent decree. To label this hearing, as the majority does in their discussion of *Stallworth's* third factor, as in effect affording the would-be intervenors "their day in court" is to render that historical figure of speech meaningless. In my view, to "have your day in court" means that one is a party to the litigation, having all of the rights of discovery, rights of presentation of evidence and witnesses, the right to have disputed issues determined by an impartial trier of fact in accordance with the rules of evidence, and ultimately the right to appeal. I do not mean to say that the trial judge erred in failing to afford such a full blown evidentiary hearing to the objectors. Clearly, Paragraph (1)(B) of subsection (n) speaks only of "a reasonable opportunity to present objections" as the second requirement after sufficient notice. This statutory provision does not even contain the word "hearing" much less the words "evidentiary hearing" in defining the manner in which objections are to be presented. But, what I do mean to say, is that the status of "objector" under Paragraph (1)(B) is a far cry from the status of "a party intervenor" and "reasonable opportunity to present objections" is not the same as "a day in court." For the majority to support its conclusion that the would-be intervenors suffered no prejudice because they had their day in court is nothing but an empty rationalization.

MOTION TO INTERVENE FOR APPEAL PURPOSES ONLY

During the course of the so-called intervention hearing, the idea that such would-be intervenors might be permitted to intervene

70

for appeal purposes only was floated by the plaintiffs and the City of Houston. The district court picked up on this idea and included it in the second paragraph of its brief order denying intervention in the underlying action. On April 19, 1993, the date specified by the district judge's invitation, the would-be intervenors filed such motions to intervene for appeal purposes only. On May 20, 1993, the district court entered an order denying the motions to intervene for purposes of appeal, and filed therewith an "Opinion on Denial of Intervention for Appeal" ("Opinion"). Since this document is the best evidence of what the district judge really had in his mind in ruling on the various motions, I quote two portions thereof which I think are extremely relevant:

1. These various groups argue that the consent decree does not help them, and worse, it hurts them. They assert that the remedy here injured them. *Their remedy is not to intervene, but to object to the decree. They did, and they were not persuasive.* (emphasis added) Opinion, at 3.

2. The non-parties assert that they should be allowed to intervene so that they can address on appeal the fact that their objections to the consent decree were overruled, and that they were not allowed to intervene in the case as parties. Their motions are made in a vacuum; they lack substance, support, and persuasion. *Id.* at 5.

While the first of the quoted paragraphs above was written some two months after the district court originally ruled on the primary motions to intervene in the main case, I think the underlined portion of that paragraph clearly indicates that the district court operated under a mistake of law as to the impact of subsection (n). For the reasons which I have set forth earlier, I think the explicit language of the statute and the supporting legislative history makes clear that rights of intervention under

71

Rule 24(a) or (b) were not changed by the passage of subsection (n).  Again, it is important to note that nowhere in its Opinion did the district court mention Rule 24(a) or (b), or subsection (n), or the *Stallworth* case, or any of the four factors defined in *Stallworth* as considerations to determine timeliness.  Given this language used in the Opinion, I think the majority's conclusion that the trial judge based his decision on "timeliness" is insupportable.

The second quoted paragraph above gives the district court's explanation for denying the motions to intervene for purposes of appeal only.  I think the district court was correct in denying such motions, but for reasons entirely different from those mentioned by the district court.  First of all, I find no authority in any federal rule of civil procedure for the filing of a motion to intervene for purposes of appeal only.  Nothing in Rule 24 refers to such a motion and no one has cited any statute which creates such right.  While I recognize that *Stallworth* characterizes our circuit's rule regarding appeal of denial of a motion to intervene as "anomalous," the majority's tacit approval of the filing of a motion to intervene for appeal only, and consideration on appeal of the denial of such a motion, carries our circuit practice beyond the area of anomaly into the area of shear nonsense.  A would-be intervenor certainly has a right to appeal from the denial of his motion to intervene under our practice, but if the trial court was right in denying such motion, then the would-be intervenor is finished, through, out-of-the case and in my

judgment should not be permitted to file further motions or notices in that case. On the other hand, if the trial court was wrong in denying the motion for intervention, then the relief at the appellate level is to vacate the judgment entered into without the would-be intervenor's participation, and remand the case with instructions to permit the intervention and proceed with a retrial. In either such event, the concept of a motion to intervene for appeal purposes only is surplusage.

Secondly, it is perfectly clear that subsection (n) does not contemplate any appellate review process after the "reasonable opportunity to present objections." That would clearly be the situation if no one ever attempted to intervene in the main proceeding and simply decided to file a motion to intervene for appeal purposes only after the trial judge has conducted the "fairness hearing" and was unpersuaded by their objections. I do not think the court should infer an appellate process where Congress has not prescribed one, especially not as to the merits of the case. In this case, the would-be intervenors whose original motions to intervene were denied, should not be able to intervene for appeal purposes only in order to appeal the court's rejections of their objections. Since they have already given their notice of appeal as to the denial of their original motions to intervene, there really is nothing further which could be considered by a motion to intervene for appeal purposes only.

Consequently, I would conclude that this court does not have appellate jurisdiction to consider the denial of a motion to

73

intervene for appeal purposes only in a Title VII action. I think the panel majority errs in undertaking that task. I note with interest however, that the panel majority proceeds to find (i) that the trial court erred in denying such motions, (ii) that the would-be intervenors had an interest sufficient to support intervention as of right and were so situated that disposition of the action may, as a practical matter, impair or impede their ability to protect that interest, and (iii) that the existing parties, i.e., the plaintiffs and the City of Houston, did not adequately represent the interest of the would-be intervenors. In so doing, the panel majority makes clear that, but for their conclusion that the original motions to intervene were "untimely," the would-be intervenors would have satisfied all of the other requirements of Rule 24(a) to justify intervention. Even assuming the trial court had denied intervention on the basis of untimeliness, and I do not believe it did, finding a motion to intervene untimely when filed both before the fairness hearing and before entry of judgment sets bold and, in my opinion, unwise new precedent. I am at a loss to understand the majority's reasoning.

Having affirmed the district court's denial of the original motion to intervene on the basis of "untimeliness," and having dismissed the appeals relating thereto, the majority now turns around and takes appellate consideration of the trial court's denial of motions to intervene for appeal purposes only, *filed by individuals and groups who were no longer in the case,* and reverses the denial of such motions on the grounds that these same persons

74

and groups met all of the requirements of Rule 24(a) to intervene.

MERITS OF CONSENT DECREE

As pointed out by the majority opinion, neither the City of Houston nor the plaintiffs filed a notice of appeal of the final judgment of the district court approving and adopting the consent decree. This is not surprising since those parties had agreed to the entry of the consent decree in the first place. The only persons and groups who filed notices of appeal as to the entry of the final judgment were the would-be intervenors who filed those notices as part of the notices of appeal relating to the denial of their motions to intervene. These notices were filed in the interval between the filing of their motions to intervene for purposes of appeal and the order of the trial court denying such motions to intervene for purposes of appeal. Consequently at the time the notices of appeal relating to the merits of the consent decree were filed, the would-be intervenors were clearly not parties to the proceeding, because their motions to intervene originally had been denied and their motions to intervene for purposes of appeal only had not been acted upon. So, in my judgment, we face another enigma quite similar to the one discussed in the preceding section, and it boils down to this question: "Can our court take appellate jurisdiction of an appeal originating from a notice of appeal filed by parties and groups who were not at that time either original parties or intervenors and whose motions to intervene for appeal purposes only had been filed but not acted upon by the district court?" My answer to the question would be,

75

"surely not." Non-parties whose motions to intervene in the main case have been denied have standing to appeal only the denial of such intervention. As to other and further proceedings in that case, they remain non-parties until the appellate court reverses the denial of their motion to intervene, which the panel majority has concluded not to do in this case. Had the district court decided to permit their intervention for appeal purposes only, some argument might be made that permission should relate back to the notices of appeal which they previously filed regarding the merits of the consent decree. But, in this case, the district court denied their motions to intervene for appeal purposes only, so no relation back concept could be at work here. In addition to the problem of standing for filing notices of appeal, we face once again the problem that subsection (n) clearly does not make provision for any appeals from whatever the trial court decides to do in light of the filing of objections. Surely, when Congress has not made provision for an appeal, the courts should not "legislate" that there be one.

For the foregoing reasons, I think the panel majority makes a mistake in addressing the merits of the consent decree. I realize, of course, that the would-be intervenors ("appellants") spend a considerable portion of their briefs arguing the merits and the plaintiffs and the City of Houston, to a lesser extent, respond. However, this court has frequently stated that we are a court of limited appellate jurisdiction, that we can and should address *sua sponte* whether our jurisdiction exists, and that neither the

76

parties' expressed nor implied consent can vest our court with jurisdiction when it does not, in fact, exist. *E.g., U.S. v. Garner,* 749 F.2d 281 (5th Cir.1985). I realize also that in an earlier portion of this dissent, I made derogatory comments about the theory of the plaintiffs' claims of "disparate impact." I did so not to try to evaluate the merits of those claims, but to indicate, that in my judgment the claims asserted by the would-be intervenors were sufficient to create a good faith controversy, and for the good of all concerned, employers and opposing groups or factions of employees, the place and time to resolve those controversies is in one single proceeding. When the employer is a public entity (as in this case) and when the relief proposed is remedial promotions and adjustments in seniority based directly on race, I think the role of a federal judge presented with a proposed consent decree takes on extremely critical importance. When the notices sent out under subsection (n) generate motions to intervene by individuals and groups of the quantity and quality as occurred in this case, i.e., the Houston Police Patrolmen's Union, the Houston Police Officers Association, the Houston Airport Police Officers Association, the Park Police Officers Association, the Asian American Police Officers Association, and the Female Police Officers Association, then the court should be extremely careful in rushing to judgment on the basis of the proposed consent decree approved by the initial parties. Our system of justice is premised on the idea that truth can best be arrived at by subjecting the contentions of each side to the critical and adversarial

77

examination by the other side. And whether, as in this case, "disparate impact" has in fact occurred, and whether, as in this case, remedies for such "disparate impact" have been carefully and narrowly tailored to cure only the "disparate impact" can best be determined by submitting the controversies to impartial jury and judge. When *all* parties potentially affected and involved agree on the essential findings and conclusions, a consent decree is certainly appropriate.[6] But when real and substantial segments of the employee population assert that "disparate impact" did not occur and that the remedial changes go beyond the scope of the alleged "disparate impact" and affect their individual interests, then they should be allowed to intervene and present those contentions ultimately, if necessary, to the jury and judge. Obviously, that may produce more work for the court and some delay at arriving at a final determination, but the provisions of the Federal Rules of Civil Procedure are clearly adequate to provide for the prompt elimination of frivolous and insupportable contentions, the severance of the process into separate liability and remedy determinations, and the entry of either summary or post-trial judgments which will truly be binding upon all of the

---

[6]Such a case was relied on, inappropriately I believe, by the trial judge. At the hearings and in the Findings of Fact and Conclusions of Law, the trial judge and the original parties relied upon evidence generated in the case involving Houston Firefighters. *Houston Chapter of the Int'l Ass'n of Black Professional Firefighters v. City of Houston,* 56 Fair Empl.Prac.Cas. (BNA) 445, 1991 WL 340296 (1991). In that case, however, the non-minority interests were certified as a class, participated in the negotiations and signed the proposed consent decree.

parties and interests and thoroughly satisfy the public interest in the finality of such determinations.

In conclusion, I do not agree that the trial court denied the motions to intervene on the basis of untimeliness. Instead, the opaque statements quoted by the majority and the district court's opinion denying intervention for purposes of appeal suggest that the trial judge believed that subsection (n) of the 1991 amendments to the Civil Rights Act established a new threshold for due process: substituting notice and an opportunity to object for a meaningful opportunity to be heard at a meaningful time. However, even if I agreed that this was the court's rationale, the decision today flies in the face of established precedent as well as the stated policy of subsection (n) of the 1991 amendments to the Civil Rights Act of 1991. As far as I know, we have never found intervention filed before entry of the consent decree to be untimely. I believe the would-be intervenors in this case acted as quickly as possible by moving approximately six weeks after statutorily anticipated notice, before the expiration of the time allotted for objections and before the fairness hearing.

I do not agree that they had their "day in court" either in the trial court below or here on appeal. Our decision today appears to condone judicial approval of privately negotiated consent decrees without consideration of potentially affected interests. Considering the preclusive effect of subsection (n) of the 1991 amendments to the Civil Rights Act, I do not think such an approach affords due process.

Finally, neither the denial of the so-called "motions to intervene for purposes of appeal only," for which I can find no basis in the Federal Rules of Civil Procedure, nor the substantive merits of the consent decree, which were appealed only by persons who were not party to this suit, were properly before this court.

For all of the foregoing reasons, I would REVERSE the decision of the trial court denying the original motions for intervention, VACATE the final judgment approving the consent decree, and REMAND this case to the trial court for further proceedings. I would also DISMISS the appeal of the denial of the motion to intervene for appeal purposes only, and DISMISS the appeal as to the merits of the final judgment entered by the trial court, on the grounds of lack of appellate jurisdiction in both cases.

* * * * * *